413 A.2d 396

**Dominick R. RANIELI**

v.

**MUTUAL LIFE INSURANCE COMPANY OF AMERICA, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 13, 1978.

Filed Oct. 26, 1979.

---

Barry A. Yelen, Wilkes-Barre, for appellant.

Joseph F. Iracki, Wilkes-Barre, for appellee.

Before PRICE, HESTER and HOFFMAN, JJ.

PRICE, Judge:

This case involves an action by appellee to recover on a sickness disability policy issued to him on February 15, 1973, by appellant, Mutual Life Insurance Company of America (Mutual). The first paragraph of that policy provides that appellee is insured "against loss . . . beginning while this Policy is in force and resulting from sickness incurred

during the term of this Policy which is contracted and begins after thirty days from the effective date of this Policy . . . ."[1] Any sickness contracted subsequent to March 15, 1973, was thus within the ambit of the policy.

In his complaint, appellee alleged that he became sick on July 11, 1973, due to an ailment later diagnosed as chronic glomerulonephritis.[2] He was hospitalized for 140 days and became totally disabled as a result of the disease. Mutual answered: (1) that the nephritis was a condition which predated the effective coverage date of the policy; and (2) that appellee had made false and fraudulent statements in his application for the policy. Pursuant to a nonjury trial conducted on April 14, 1977, a verdict was returned in favor of appellee in the amount of $23,900. Appellant's motion for a new trial was denied, but the court en banc modified the verdict so as to reduce the total recovery to $20,900.[3] Appellee filed a timely remittitur as required by the court below, and appellant subsequently perfected this appeal. Appellant now contends that: (1) the verdict was against the facts and the weight of the evidence; and (2) the lower court erred in excluding certain pieces of information from a hypothetical question propounded by appellee's counsel. We agree with appellant's second argument, and consequently reverse and remand for a new trial.

## I

In an attempt to demonstrate that appellee's sickness antedated the effective date of the policy, appellant placed on the stand Dr. Basil M. Rudusky, an expert in internal medicine and cardiovascular diseases. In the course of Dr.

1. Because the computation of the precise amount of recovery is not disputed on this appeal, provisions of the policy relating to recoverable benefits are not here reproduced.

2. Glomerulonephritis is a disease in which the vessels within the kidney have been damaged or hardened through the exertion of pressure.

3. The award was composed of $1,400 for hospitalization indemnity, $16,500 for monthly sickness indemnity, and $3,000 for monthly sickness indemnity (nonconforming sickness).

Rudusky's testimony, appellant's counsel submitted a hypothetical question to the witness. The question incorporated information on appellee's physical condition and history prior to March 14, 1973, and invited the witness to consider, *inter alia*, "that [appellee] had a history of hypertension and that Dr. Adonizio [appellee's personal physician] had made reference to a possibility that there was a medical report saying that at least ten years prior to July 18, 1973, he had been diagnosed to have albumin in the urine and high blood pressure about a year before the 1973 date." (N.T. 127). Before the witness could state an opinion on whether these symptoms indicated kidney involvement, an objection was interposed. Following discussion, Dr. Rudusky was not allowed to consider any incident of hypertension or albumin in the urine.[4] Confronted with this truncated hypothetical, the witness testified that, "since two of the most important things have been omitted," (N.T. 133), he could not conclude with reasonable medical certainty that appellee had any kidney involvement prior to March 14, 1973.

The continued use of the hypothetical question placed to an expert witness has occasionally been assailed as anachronistic and confusing, McCormick, Evidence § 16 (1954), but it remains a viable and accepted method of allowing the expert witness to render an opinion based on facts not known to him personally. *See Houston v. Canon Bowl, Inc.*, 443 Pa. 383, 278 A.2d 908 (1971); *Abbott v. Steel City Piping Co.*, 437 Pa. 412, 263 A.2d 881 (1970); *Gordon v. State Farm Life Insurance Co.*, 415 Pa. 256, 203 A.2d 320 (1964). In forming the hypothetical, however, it is necessary that all information contained therein be properly of record. *See Houston v. Canon Bowl, Inc., supra; McKenzie v. Cost Brothers, Inc.*, 260 Pa.Super. 295, 394 A.2d 559 (1978); *Commonwealth v. Pilosky*, 239 Pa.Super. 233, 362 A.2d 253 (1976); *Hussey v. May Department Stores, Inc.*, 238 Pa.Super. 431, 357 A.2d 635 (1976); 2 Wigmore, Evidence 3d ed.

---

4. In his brief, appellant also argues that the witness was precluded from considering the fact of high blood pressure. This contention is belied by the record, however, which clearly indicates that Dr. Rudusky took that fact into account when formulating his opinion.

§ 682 (1940). *See generally* 56 A.L.R.3d 300 § 6[a] (1974). Absent this record foundation, the information proffered in hypothetical questions could be so manipulated as to yield almost any response, and in so doing, seriously confuse the finder of fact. The expert's opinion is properly admissible to illuminate obscure and obtuse areas of knowledge. The hypothetical question should be employed to facilitate this end, focusing the witness' expertise onto the narrow issue under consideration; its purpose is not to further obfuscate the complex evidentiary labyrinth through which the finder of fact must carefully tread. Of course, such record evidence upon which the expert relies may be based upon personal examination, the assumed truth of the testimony of other witnesses, or upon a combination of these sources. *Hussey v. May Department Stores, Inc., supra.* The pivotal question in the case at bar is thus whether the two contested pieces of information were properly of record.

■ The information with respect to albumin in appellee's urine was first introduced by Dr. Adonizio during cross-examination. At that time, Dr. Adonizio testified that he had knowledge of a report composed by a Dr. Myers, which had been prepared pursuant to a request by the former for Dr. Myers, to examine appellee for consultation. In reading from that report, Dr. Adonizio quoted Dr. Myers as stating that appellee was " 'first noted at least ten years ago to have albumin in his urine and to have high blood pressure a year ago,' . . .." (N.T. 90). Dr. Adonizio then continued to explain that traces of albumin do not necessarily evidence the presence of nephritis. Counsel for appellee made a timely objection to the introduction of this evidence which was overruled by the court below. It thus appears that the necessary evidence of the albumin was in the record and appellant should have been allowed to include it in his hypothetical question.

■ Even assuming, *arguendo,* that the statement was not properly admitted, it is nonetheless amenable to being employed in the hypothetical question. In *Commonwealth v. Thomas,* 444 Pa. 436, 282 A.2d 693 (1971), our supreme court

ruled that a medical witness may express an opinion on medical matters based in part upon reports of others which are not in evidence, but which the expert customarily relies upon in the practice of his profession. In *Thomas*, the appellant was examined by a private physician, Dr. Herring, and a court psychologist. The latter was not called to testify during trial. When Dr. Herring assumed the stand for the Commonwealth in order to testify as to appellant's competency, he employed his own interview with appellant, the tests of the court psychologist, and the results of numerous other psychological tests performed on Thomas.[5] The use of the psychological testing and the reports of Dr. Herring, even if hearsay, were thus available for inclusion in the hypothetical because they were reports from others customarily relied upon by the expert witness. Instantly, there appears to be no reason why an expert may not base his opinion, in part, on information derived from a report relied upon by another expert witness, Dr. Adonizio.

■ As to the evidence of appellee's hypertension, the sole reference in the record to this fact appears in a report compiled by a Dr. John F. Coyle while appellee was a patient at the University of Pennsylvania Hospital.[6] In that section of the report titled "review of symptoms", the following is noted: "ROS reveals that hypertension was first noted in 1972 during 'virile infection,' but was never followed up." (Brief for Appellant at 13).[7] It is not indicated in the report whether this information was garnered from another hospital record or from the patient himself.[8]

5. These tests were also employed by the defense psychiatrist in forming his opinion of insanity.

6. Appellee was admitted to the University of Pennsylvania Hospital following examination by Dr. Adonizio and administration of a battery of tests at the Pittston Hospital.

7. The pertinent portion of Defendant's Exhibit 3—Dr. Coyle's notes—is reproduced in appellant's brief.

8. Appellee argues initially that appellant has "waived" any right to object, because when the court excluded the information from the hypothetical question, it granted counsel an opportunity to direct its

■ First, it must be noted that the precise nature of the information posed by appellee in the hypothetical question was: "the patient had a history of hypertension." (N.T. 127). The trial court, however, in ruling upon the objection to the hypothetical, stated that, "I think your question posed, and we'll have it read, please, of course, 'a continued history of hypertension.' " (N.T. 129). The insertion by the court below of the adjective "continued" demanded that appellant produce record evidence that appellee had suffered several incidents of hypertension. This appellant could not do, but such a demonstration was unnecessary. The alteration of a "history of hypertension", to a "*continued* history of hypertension" was the act of the trial court, not of counsel. Appellant should not be compelled to provide record evidence for questions not of his own design.[9]

■ Next, we believe that the information as supplied by counsel could properly have been considered by the witness in formulating his opinion. The modern trend is towards a more liberalized use of hospital records, and we have noted that they are admissible to show hospitalization, treatment, and stated symptoms. *Commonwealth v. Mobley*, 450 Pa. 431, 301 A.2d 622 (1973); *Jumper v. Jumper*, 240 Pa.Super. 99, 362 A.2d 411 (1976). We see no reason why the informa-

attention to that part of the record which specifically noted a continued history of hypertension. Counsel failed to immediately do so, indicating that the notes of Dr. Coyle were not in court. He also admitted that a secondary source for the same information, the notes of Dr. Adonizio, were not in evidence. Nevertheless a short time later, counsel succeeded in bringing the court's attention to the precise point in Dr. Coyle's notes which mentions the hypertension. We do not believe that this temporary inability of counsel to advise the court should constitute a "waiver." Although it is obviously difficult for the trial judge to rule on the admissibility of a piece of information when he is uncertain of its record status, the judge is charged with knowledge of the trial proceedings. In light of the fact that the court was directed to the correct area of the record immediately following the incident, we cannot say that appellee should be precluded from presenting his argument.

9. Indeed, appellee concedes that "If defendant's expert were prevented from considering one instant of hypertension he may have cause to complain; . . . ." (Brief for Appellee at 13). This was, in fact, precisely what appellant's expert was prevented from considering.

tion contained in the records, which were admitted into evidence, should not be allowed to be included in the hypothetical.[10]

## II

Anticipating our conclusion that the preceding information was properly admissible, appellee contends that the error was nevertheless harmless. He reaches this conclusion by arguing as follows: the policy excludes coverage for a pre-existing "sickness"; "sickness" may be defined as a disabling or manifested illness; appellee was not disabled, nor was the disease manifest, prior to the effective coverage date; thus, Dr. Rudusky's opinion as to whether appellee suffered from incipient—*i. e.* non-manifest—nephritis prior to March 15, 1973, was irrelevant. While we agree with appellee's interpretation of "sickness", we perceive a flaw in his logic.

Preliminarily, it is well settled that insurance policies are in essence contracts of adhesion, and consequently, any ambiguities or uncertainties in language are construed strictly against the insurer and in favor of coverage. *Mohn v. American Casualty Co.*, 458 Pa. 576, 326 A.2d 346 (1974); *Burne v. Franklin Life Insurance Co.*, 451 Pa. 218, 301 A.2d 799 (1973). Moreover, words in such contracts are given their plain and popular meanings. *Blocker v. Aetna Casualty and Surety Co.*, 232 Pa.Super. 111, 332 A.2d 476 (1975); *Slate Construction Co. v. Bituminous Casualty Corporation*, 228 Pa.Super. 1, 323 A.2d 141 (1974).

With these axioms as a foundation, an examination of the instant policy discloses that "sickness" is nowhere defined, nor have the appellate courts of this Commonwealth construed that word in the context of a disability policy wherein coverage is limited to a sickness originating or contracted after a stipulated date. Other jurisdictions have confronted this problem, however, and by employing similar reasoning have reached substantially uniform results.

10. The information was, at any rate, includable in the hypothetical under the *Thomas* rationale discussed *supra*.

Webster defines sickness as "(1) diseased condition; illness; ill health;" and a "(2) malady; a form of disease." The same work defines illness as a "state of being ill or such; disease, ailment, malady; disorder of health; sickness." Further, disease is defined as a "condition in which bodily health is seriously attacked, deranged or impaired; sickness; illness" and pathologically "disease is an alteration of state of the human body or of some of its organs or parts interrupting or disturbing the performance of vital functions or a particular instance or case of this; any departure from the state of health presenting marked symptoms; also a specific kind of such alteration; a particular ailment having special symptoms or causes."

Although technically synonymous, these words have assumed clear and divergent meanings when employed in disability insurance clauses delaying coverage until a stipulated date. Sickness has been deemed to have its inception when the disease first becomes manifest or active, or when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease. *E. g., Keller v. Orion Insurance Company*, 422 F.2d 1152 (8th Cir. 1970); *Mutual Hospital Ins., Inc. v. Klapper*, 153 Ind.App. 555, 288 N.E.2d 279 (1972); *Dirgo v. Associated Hospitals Service, Inc.*, 210 N.W.2d 647 (Iowa 1973); *Southards v. Central Plains Insurance Co.*, 201 Kan. 499, 441 P.2d 808 (1968); *State National Life Insurance Co. v. Stamper*, 228 Ark. 1128, 312 S.W.2d 441 (1958); *Malone v. Continental Life and Accident Co.*, 89 Idaho 77, 403 P.2d 225 (1965); *Horace Mann Mutual Insurance Co. v. Burrow*, 213 Tenn. 262, 373 S.W.2d 469 (1963); 43 Am.Jur.2d Insurance § 1205 (1969); 45 C.J.S. Insurance § 893 (1946). *See generally* 53 A.L.R.2d 686 (1957).[11]

11. The sole Pennsylvania case on point is *Perhacs v. Georgia International Life Insurance Co.*, 32 Somerset L.J. 367 (1973). In that case, the insurance policy contained a clause permitting recovery for " 'sickness originating after the date of (the) policy and while (the) policy is in force.' " *Id.* at 368. In analyzing the cases dealing with the interpretation of this clause, the Honorable Thomas F. Lansberry

■ Thus, the insured may recover under such a policy even though the medical cause of his sickness may have predated the effective date of the policy. Recovery is, however, conditioned on the fact that prior to the stipulated date, the sickness was not manifest, nor could it have been diagnosed with reasonable certainty by one learned in medicine. Such a policy is reasonable and salutary. Insurers require protection from applicants who would fraudulently attempt to gain coverage for illnesses of which they are aware or should be aware. To deny coverage because of an incipient disease that has not made itself manifest, however, is to set an unconscionable trap for the unwary insured. If the term "contracted" and "sickness" in clauses postponing protection were given an expansive construction, the purported coverage would be illusory. The mere presence of latent germs in the body would act to deny recovery on an otherwise meritorious claim. Indeed, if such were the case, there would be few recoveries on policies of this type, for it is probably rare that an adult is not diseased as such, if by "disease" one means only that the seeds of a future disabling illness are already planted in the body.

■ Instantly, appellee is entitled to recover on his policy if his bodily system was afflicted with nephritis prior to March 17, 1973, provided that he was not yet disabled, nor had he manifested any symptoms as of that date. Appellee errs, however, in arguing that this conclusion would render Dr. Rudusky's opinion irrelevant. On the contrary, the information contained in the hypothetical question propounded to Dr. Rudusky was available prior to the effective date of coverage. Consequently, had Dr. Rudusky, based on this information, opined that appellee was indeed suffering from nephritis, the logical inference would be that a competent medical practitioner would have been capable of diagnosing those symptoms as well. It would, of course, remain for the trier of fact to determine the weight to be accorded such an opinion, *Kuisis v. Baldwin-Lima-Hamilton Corpora-*

of Allegheny County reached the same conclusion as contained herein.

*tion,* 457 Pa. 321, 319 A.2d 914 (1974); *Commonwealth v. Williams,* 432 Pa. 44, 246 A.2d 356 (1968); *Rose v. Hoover,* 231 Pa.Super. 251, 331 A.2d 878 (1974), but had it been accepted, a verdict could have been returned in appellant's favor. Consequently, we cannot say that the error was harmless.

The order of the court below is therefore reversed, and the case remanded for proceedings consistent with this opinion.

HOFFMAN, J., concurs in the result.