George A. HUGHES, Plaintiff, Appellant,

v.

BOSTON MUTUAL LIFE INSURANCE COMPANY, Defendant, Appellee.

No. 93–2077.

United States Court of Appeals, First Circuit.

Heard May 5, 1994.

Decided July 18, 1994.

---

John Silvia, Jr., with whom Long & Silvia, Fall River, MA, was on brief for appellant.

Ralph C. Copeland, with whom Copeland & Hession, Wellesley, MA, was on brief for appellee.

Before TORRUELLA and STAHL, Circuit Judges, and CARTER,* District Judge.

STAHL, Circuit Judge.

In this appeal, plaintiff-appellant George Hughes ("Hughes") contends that the district court erred in granting summary judgment for defendant-appellee Boston Mutual Life Insurance Company ("Boston Mutual") on Hughes' claim of entitlement to disability benefits under a group insurance plan. The lower court allowed the motion on the basis that Hughes' receipt of medical treatment for symptoms of multiple sclerosis triggered the "pre-existing condition" exclusion in the insurance policy issued to Hughes by Boston Mutual. We vacate and remand for further proceedings.

## I.

### BACKGROUND

Multiple sclerosis ("MS") is a grave disorder of the nervous system. *See generally Cury v. Colonial Life Ins. Co. of America*, 737 F.Supp. 847, 850 (E.D.Pa.1990). The cause of MS remains shrouded in mystery and a cure still lies beyond the grasp of medical science. Symptoms of MS include

weakness, fatigue, incoordination, and difficulty walking. Another common symptom of multiple sclerosis is spastic paraparesis which is a stiffness, weakness, or spasticity in the lower extremities. Finally, depression is very common in multiple sclerosis patients.

*Id.*

MS "follows a slow, progressive course marked by a history of exacerbations and remissions." *Id.* The disease cannot be diagnosed with certainty during the life of the patient. Thus, depending on the results of observation and sophisticated testing, a physician may make a diagnosis of "most likely," "likely [or probable]," or "possible" MS. *See id.*

The circumstances leading to Hughes' claim for disability caused by MS are relatively straightforward. Hughes became a permanent employee of the University of Massachusetts in November 1987, and later applied to enroll in a group disability insurance plan available to University of Massachusetts employees through Boston Mutual. Boston Mutual approved the application, designating February 1, 1988 as the effective date of coverage.

The disability insurance policy ("the Policy") contains the following language setting forth an exclusion of coverage for disability arising from a pre-existing condition:

This policy will not cover any total disability:

1. which is caused or contributed to by, or results from a pre-existing condition; and

2. which begins in the first 12 months after the insured's effective date ["the probationary period"], unless he received no treatment of the condition for 6 consecutive months after his effective date.

"Treatment" means consultation, care or services provided by a physician including diagnostic measures and taking prescribed drugs and medicines.

"Pre-existing Condition" means a sickness or injury for which the insured received treatment within 6 months prior to the insured's effective date ["the pre-probationary period"].

The events that occurred within each of the relevant periods are essentially undisputed. During the pre-probationary period (August 1, 1987 to February 1, 1988), Hughes experienced a number of symptoms consistent with MS. In August 1987, Hughes visited Dr. Daniel Sullivan, complaining of numbness in both lower extremities, loss of balance, and gastrointestinal problems. Dr. Sullivan prescribed medication for the gastrointestinal symptoms, but made no diagnosis of MS.

Although the record contains an unrebutted after-the-fact diagnosis from Dr. David Dawson that Hughes was "suffering from multiple sclerosis" in August 1987, deposition testimony from Dr. Dawson and other physicians suggests that Hughes' condition was not amenable to any type of clinical diagnosis

---

* Of the District of Maine, sitting by designation.

during the pre-probationary period. Dr. Sullivan testified that the symptoms he observed in the summer of 1987 "would not create the impression of multiple sclerosis." Dr. Jeremy Worthington (who, in March 1988, diagnosed Hughes as having MS) confirmed that the loss of balance reported to Dr. Sullivan in August 1987 is "a very non-specific complaint," which is "not enough to establish ... [a]nything." Dr. Dawson initially testified that he had "no opinion about the diagnosability of multiple sclerosis in 1987." Dr. Dawson did testify that Hughes' condition could have been diagnosed as "clinically probable multiple sclerosis" in February 1988[1] (*after* the expiration of the pre-probationary period), but did not advance an opinion as to the diagnosability of MS during the pre-probationary period. Finally, Dr. Dunn, an ophthalmologist who treated Hughes in June 1987 (*before* the pre-probationary period) wrote "possible MS" in his notes, but there is no evidence that Dr. Dunn communicated his hypothesis either to Hughes or to any treating physician during the pre-probationary period.

During the first six months of the probationary period (February 1, 1988 to July 1, 1988), Hughes received additional medical attention. On March 1, Hughes experienced various symptoms, including "extreme fatigue, inability to maintain balance, double vision, lack of coordination with walking, and slurring of speech." On March 10, Dr. Jeremy Worthington diagnosed Hughes as suffering from MS. On April 5, Hughes underwent Magnetic Resonance Imagery ("MRI") testing, which confirmed the Worthington diagnosis.

1. Although Dr. Dawson actually testified that Hughes could have been diagnosed as suffering from "probable MS" in February *1987* (*before* the commencement of the pre-probationary period), the record suggests that Dr. Dawson may have intended to refer to February 1988. The reference to 1987 seems to spring from Dr. Dawson's understanding of a letter he wrote to Dr. Worthington on May 31, 1988 summarizing Hughes' medical history. The typewritten text of that letter (attached as part of Exhibit 5 to Boston Mutual's motion for summary judgment) contains a paragraph describing an outbreak of suspicious symptoms to February 1988, although it appears that either the author or the recipient used a pen or pencil to change "1987" to "1988" as well as to cross out the paragraph recounting

Later in the probationary period, Hughes' worsening condition made it increasingly difficult for him to work. At the suggestion of Dr. Sullivan, Hughes terminated his employment with the University of Massachusetts on July 6, 1988, and filed a disability claim with Boston Mutual.

Boston Mutual denied the claim in November 1988, prompting Hughes to file this action in Massachusetts Superior Court.[2] Because the Policy is a group insurance plan regulated by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* (1988 & Supp.1992) ("ERISA"), Boston Mutual removed the action to the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1441 (1988 & Supp.1992). The district court granted Boston Mutual's motion for summary judgment, *Hughes v. Boston Mut. Life Ins. Co.*, No. 91–10179–WD (D.Mass. Aug. 27, 1993), and this appeal followed.

## II.

### *PROCEDURAL PRINCIPLES*

Where, as here, the administrator of an ERISA-regulated plan does not allege that it has discretion under the plan to interpret the terms of the insurance policy, judicial review of a denial of benefits entails no deference to the administrator's explanation of the plan and follows the familiar course of an action for breach of an insurance contract. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103

a second issue. To add to the confusion, the briefs of both parties adopt the district court's findings, which do not mention an episode in February 1987. In light of this contrary evidence and our duty to view the evidence in the light most favorable to Hughes, we infer that February 1988 should be the date of Dr. Dawson's retrospective diagnosis.

2. Although Count I refers simply to a breach of contract claim, the complaint plainly seeks to recover benefits under an ERISA-regulated plan pursuant to 29 U.S.C. § 1132(a)(1)(B) (1988). Federal and state courts have concurrent jurisdiction over such claims. 29 U.S.C. § 1132(e)(1) (1988).

L.Ed.2d 80 (1989); *Allen v. Adage, Inc.*, 967 F.2d 695, 697–98 (1st Cir.1992).

▬▬▬ Similarly, an appellate court independently weighs the merits of a motion for summary judgment, without deference to the reasoning of the district court. *See Bird v. Centennial Ins. Co.*, 11 F.3d 228, 231 (1st Cir.1993). Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party opposing summary judgment "may not rest upon the mere allegations or denials of [its] pleading[s], but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841–42 (1st Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). Moreover, where the non-moving party bears the burden of persuasion at trial, it can only avert summary judgment with a display of evidence "sufficient to establish the existence of [the] element[s] essential to [its] case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Finally, a court deciding a motion for summary judgment cannot assume the skepticism of the fact-finder, but must draw all reasonable inferences in favor of the non-moving party. *See Levy v. FDIC,* 7 F.3d 1054, 1056 (1st Cir.1993).

### III.

### DISCUSSION

▬▬▬ While we normally look to the law of a particular state to guide our construction of a contract, "a federal common law of rights and obligations" governs the interpretation of an ERISA-regulated group insurance plan. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 1557–58, 95 L.Ed.2d 39 (1987); *Burnham v. Guardian Life Ins. Co. of America,* 873 F.2d 486, 489 (1st Cir.1989). The need for federal uniformity in this area does not, however, require federal rules at variance with the general law of the states. Indeed, we have noted that the emerging federal common law "must embody common-sense canons of contract interpretation," *id.,* of which state law is the "richest source," *Rodriguez–Abreu v. Chase Manhattan Bank, N.A.,* 986 F.2d 580, 585 (1st Cir.1993). Thus, "straightforward language in an ERISA-regulated insurance policy should be given its natural meaning." *Burnham,* 873 F.2d at 489. Similarly, in keeping with the rule of *contra proferentem,* ambiguous terms should be strictly construed against the insurer. *Rodriguez–Abreu,* 986 F.2d at 586; *see also Lee v. Blue Cross/Blue Shield,* 10 F.3d 1547, 1551 (11th Cir.1994) (collecting cases to demonstrate that *contra proferentem* rule "has been widely adopted" among circuit courts for resolution of ambiguities in ERISA-regulated insurance contracts); *cf. Allen,* 967 F.2d at 701 n. 6 (holding that *contra proferentem* principle does not apply to ERISA contracts beyond the insurance context). *But cf. Brewer v. Lincoln Nat'l Life Ins. Co.,* 921 F.2d 150, 153–54 (8th Cir.1990) (holding that state law policy of construing ambiguities in favor of the insured could not govern interpretation of ERISA policy), *cert. denied,* 501 U.S. 1238, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991); *McMahan v. New England Mut. Life Ins. Co.,* 888 F.2d 426, 429–30 (6th Cir.1989) (same).[3] Nevertheless, sympathy for either

---

3. *Brewer* and *McMahan* primarily involve the question of whether a state law rule of contract construction controls the interpretation of an ERISA contract. It is unclear whether either court actually rejects the *contra proferentem* principle as a rule of federal common law. The court in *Brewer* comes closest to doing so, citing as support the Supreme Court's statement that courts should construe provisions in ERISA plans " 'without deferring to *either* party's interpretation.' " 921 F.2d at 154 (emphasis in original) (quoting *Bruch,* 489 U.S. at 112, 109 S.Ct. at 955). The quotation from *Bruch* is accurate, but cannot support the holding in *Brewer*. *Bruch* concerns the standard for judicial review of benefit determinations by fiduciaries or plan administrators under ERISA. 489 U.S. at 105, 109 S.Ct. at 951. The Court's preference for *de novo* review of nondiscretionary decisions, *id.* at 115, 109 S.Ct. at 956–57, in no way limits a court's ability to select appropriate rules of contract interpretation in aid of its *independent* construction of disputed terms. In any event, the Eighth Circuit has since construed *Brewer* as allowing the application of *contra proferentem* to an ERISA-regulated insurance plan, but only after the court attempts to resolve an apparent ambi-

269

party cannot justify sophistry. "[C]ourts have no right to torture language in an attempt to force particular results or to convey delitescent nuances the contracting parties neither intended nor imagined." *Burnham,* 873 F.2d at 489.

■ The exclusion clause at issue here does not apply to pre-existing conditions in the ordinary sense. A routine pre-existing condition clause aims to bar coverage for claims arising from conditions *existing* before the effective date of an insurance policy; such policies focus on the prior origination or prior manifestation of the condition. *See generally* 1B John Alan Appleman & Jean Appleman, *Insurance Law and Practice,* § 396 (1981 & Supp.1993). The clause in Hughes' policy might be described more accurately as a "recent treatment" exclusion because it prohibits coverage for any total disability which occurs during a probationary period and is attributable to a condition for which the insured received medical treatment just prior to the probationary period.

Unlike the standard pre-existing condition clause, the recent treatment exclusion is not strictly designed to weed out known insurance risks; it would even permit activity which, if not reported on an application for a policy with a standard pre-existing condition clause, might suggest fraud. For example, as counsel for Boston Mutual suggested at oral argument, an insured who was disabled within the probationary period and did not receive medical treatment for a condition contributing to the disability during the pre-probationary period would be entitled to coverage even if she (1) received treatment for such a condition *before* (but not during) the pre-probationary period, (2) knowingly suffered from symptoms of the condition during the pre-probationary period without seeking medical attention, or (3) received treatment during the pre-probationary period for a broken arm (not a symptom of MS) caused by a fall attributable to loss of balance resulting from undiagnosed MS.

guity by favoring the "ordinary" meaning of a disputed term. *See Delk v. Durham Life Ins. Co.,* 959 F.2d 104, 105–06 (8th Cir.1992) (per curiam).

■ We also note that the exclusion is not triggered by any medical treatment, only by treatment "for" a "sickness or injury" (the "[c]ondition") which "caused or contributed to ... or results" in a "total disability." As several other courts interpreting similar language have observed, the exclusion does not explicitly require diagnosis. *Marshall v. UNUM Life Ins. Co.,* No. A3–91–201, 1992 WL 554314, at *2 (D.N.D. Nov. 6, 1992), *aff'd,* 13 F.3d 282 (8th Cir.1994); *Cury,* 737 F.Supp. at 854. But neither does the exclusion explain what constitutes treatment "for" a particular condition. Boston Mutual suggests that treatment "for" a condition refers to treatment of any symptom which in hindsight appears to be a manifestation of the condition. We acknowledge that this would be one reasonable interpretation of the exclusion. *See Bullwinkel v. New England Mut. Life Ins. Co.,* 18 F.3d 429, 432–33 (7th Cir. 1994) (holding that treatment of malignant breast lump in pre-probationary period triggered recent treatment exclusion although lump was not definitively diagnosed as cancer until later time); *Cury,* 737 F.Supp. at 854–55 (holding that treatment for symptoms of undiagnosed multiple sclerosis in critical period activated recent treatment exclusion). But Boston Mutual's interpretation is not the only plausible one. Hughes reasonably suggests that the exclusion requires some awareness on the part of the physician or the insured that the insured is receiving treatment for the condition itself. *See Ross v. Western Fidelity Ins. Co.,* 881 F.2d 142, 144 (5th Cir.1989) ("[T]here is at least a reasonable argument that, under [a recent treatment exclusion], treatment *for a specific condition* cannot be received unless the specific condition is known.") (emphasis in original); *Karagon v. Aetna Life Ins. Co.,* 58 Mich.App. 677, 228 N.W.2d 515, 516 (1975) (holding that treatment of symptoms of undiagnosed multiple sclerosis did not trigger recent treatment exclusion where disease did not manifest itself with sufficient clarity to allow reasonably accurate diagnosis and treatment).[4] Nor is there extrinsic evidence which would allow

4. We note that *Ross* is not irreconcilable with *Bullwinkel,* in which the court may not have had the occasion to address the ambiguity alleged here and in *Ross.* Indeed, the Seventh Circuit

us to choose one plausible interpretation over the other as a matter of law. Because the exclusion is susceptible to "reasonable but differing interpretations," we find it to be ambiguous. *Rodriguez–Abreu,* 986 F.2d at 586.[5] And, because we interpret ambiguities against the insurer, *id.; Lee,* 10 F.3d at 1551, we adopt for purposes of summary judgment the construction offered by Hughes.[6]

The sole remaining task is to apply the exclusion to the facts at hand. The parties have identified MS as the "[c]ondition" which "caused or contributed to ... or result[ed]" in Hughes' "total disability." *E.g.,* Appellee's Br. at 14. At this stage, it is undisputed that neither Hughes nor the physicians who treated his symptoms during the pre-probationary period were aware that he was being treated for "most likely MS," "probable MS," or even

"possible MS." Therefore, we cannot say as a matter of law that Hughes received treatment "for" MS during the critical six months before the effective date of the Policy.

## IV.

### CONCLUSION

For the foregoing reasons, we vacate the judgment below and remand for further proceedings consistent with this opinion.

*So ordered.*

---

specifically stated that "this case is unique because the Bullwinkels' attorney really rested his entire appeal on the argument that a court may not infer that a lump discovered to be cancerous in one month was also cancerous two months before.... We make no statement about what might happen if an attorney in a future case presents different arguments and authority to the court." 18 F.3d at 433.

5. In so stating, we obviously reject the reasoning of some other courts that have construed similar language by focusing exclusively on the absence of a requirement for diagnosis without seriously considering whether the language concerning treatment "for" a particular condition is ambiguous. *See Marshall,* 1992 WL 554314, at *2 ("[T]he language of the policy in the instant case is clear and unambiguous; diagnosis is not required by the policy for a finding that there is a pre-existing condition."); *Cury,* 737 F.Supp. at 854 ("There is no requirement that a diagnosis, definite or otherwise, of the pre-existing condition must be made during the pre-existing condition period."). Under the interpretation suggested by Hughes, a physician's awareness of the sickness would probably require at least a tentative diagnosis; however, it may be that no diagnosis would be necessary if the insured was already aware of the condition.

6. The trier of fact must resolve any ambiguities in an ERISA contract identified by the court and incapable of definitive resolution on the existing record. *See Allen,* 967 F.2d at 698; *see also Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan,* 3 F.3d 994, 999 (7th Cir.1993); *Teamsters Indus. Employees Welfare Fund v. Rolls–Royce Motor Cars, Inc.,* 989 F.2d 132, 135 n. 2 (3rd Cir.1993); *D.E.W., Inc. v. Local 93, Laborers' Int'l Union,* 957 F.2d 196, 199 (5th Cir.1992). Moreover, despite any interpretive presumption favoring the insured, an insurer may seek to overcome that presumption with probative evidence. *See* Stephen L. Liebo, 13 *Appleman's Insurance Law and Practice* § 7403, at 75 (Supp.1993) ("Where a policy is ambiguous, grounds, including appropriate extrinsic evidence, may be found to show that the interpretation unfavorable to an insured was the one reasonably understood by both parties; it is only when the ambiguity still remains after the resort to such extrinsic evidence that an ambiguous provision is to be construed against the insurer."). Therefore, Boston Mutual would remain free to introduce evidence at trial that its interpretation is the more reasonable one.