**Joseph LAWSON and Tammy Malatak, on behalf of Minor Child Elena Lawson, Plaintiffs,**

v.

**FORTIS INSURANCE COMPANY, Defendant.**

### No. CIV.A. 00–6538.

United States District Court, E.D. Pennsylvania.

June 20, 2001.

---

Michael J. Salmanson, Philadelphia, PA, for Plaintiffs.

James M. Dunn, Andrew F. Susko, White and Williams, Philadelphia, PA, for Defendant.

### MEMORANDUM & ORDER

KATZ, Senior District Judge.

This case concerns a preexisting condition exclusion contained in a short-term medical insurance policy issued by defendant Fortis Insurance Company and purchased by plaintiff Joseph Lawson for himself and his daughter Elena Lawson. Plaintiffs bring claims for breach of contract and bad faith. Now before the court are the plaintiffs' motion for partial summary judgment and the defendant's motion for summary judgment.

### I. Background

Mr. Lawson obtained the Fortis policy for himself and Elena on October 7, 1998, and the policy became effective two days later on October 9. At issue is the medical expenses incurred by Elena for the diagnosis and ultimately successful treatment of her leukemia during the time that the Fortis policy was in effect. Fortis denied coverage for these expenses on the grounds that the leukemia was a preexisting condition. The policy excludes coverage for a preexisting condition, defined as:

A Sickness, Injury, disease or physical condition for which medical advice or treatment was recommended by a Physician or received from a Physician within the five (5) year period preceding that Covered Person's Effective Date of Coverage.

Pl. Mem. in Supp. of Partial Summ. J., Ex. 1 (Policy) at 3, 10. "Sickness" is defined by the policy as: "An illness, disease or condition which is diagnosed or treated while this policy is in force." *Id.* at 3. Disease and physical condition are not defined.[1]

On October 7, 1998, Elena's mother, plaintiff Tammy Malatak, brought Elena to the emergency room at Palmerton Hospital. According to hospital records, Ms. Malatak reported that Elena "was running a temperature since yesterday, about 102 degrees F." Pl. Mem. in Supp. of Partial Summ. J., Ex. 2. Other symptoms exhibited by Elena included a swollen eye, a dry hacking cough, and a scratchy throat. *Id.* Ms. Malatak also testified at her deposition that Elena seemed sluggish and that Tylenol had not reduced her fever. Def. Answer to Pl. Mot. for Partial Summ. J., Ex. A at 29, 42–43. Dr. Shailesh Parikh, the emergency room doctor, diagnosed an upper respiratory inflection.[2] *Id.* He prescribed antibiotics and allergy medicine, told Ms. Malatak to treat Elena's fever with Tylenol or Advil, and to take Elena to her regular doctor for follow up in one or two days. *Id.;* Def. Mem. in Supp. of Summ. J., Ex. C at 24. Dr. Parikh also told Ms. Malatak to bring Elena back to emergency room if the fever continued or worsened. *Id.*

On October 13, 1998, after the policy was effective, Elena again sought medical treatment, this time from Dr. Narendra Ambani. According to the doctor's treatment notes, Elena's symptoms at that time included an on-and-off fever for one week, dizziness, lower back pain, coughing and vomiting five times that day. Pl. Mem. in Supp. of Partial Summ. J., Ex. 3. Dr.

---

1. The parties agree that the policy language regarding an Injury is not relevant to this matter.

2. While the parties agree that no one diagnosed Elena with leukemia prior to the effective date of coverage, defendant contends that Elena was not suffering from an upper respiratory infection on October 7, but rather, was displaying the symptoms of leukemia.

Ambani diagnosed an upper respiratory infection, gastroenteritis, and possible bronchitis. He continued the medication prescribed by Dr. Parikh. *Id.* The next day, Elena visited yet another physician, Dr. Mira Slizovskaya. While noting that Elena exhibited signs of bronchitis, Dr. Slizovskaya also felt that her patient "looked sick, out of proportion to [her] physical findings" and ordered a number of tests, including a complete blood count. Def. Mem. in Supp. of Summ. J., Ex. F at 17, 25. The blood count revealed abnormalities and after additional testing, Elena was transferred to Children's Hospital of Philadelphia on October 15, with the preliminary diagnosis of pneumonia, sepsis and leukemia.

After investigation, Fortis denied Elena's application for benefits on the grounds that her leukemia was a preexisting condition within the meaning of its policy. According to Dr. Raymond Brumblay, Fortis' medical director,

> The leukemia began and produced symptoms for which the patient was brought to the Palmerton Emergency Department prior to the effective date. While the evaluation there failed to diagnose leukemia, advice and treatment for those symptoms were received from a physician. This meets the policy definition of a pre-existing condition.

Def. Mem. in Supp. of Summ. J., Ex. E.

Dr. Brumblay conceded at his deposition that the symptoms Elena presented at the emergency room October 7 would not suggest to a reasonable physician that, at that time, Elena had leukemia. Pl. Mem. in Supp. of Partial Summ. J., Ex. 7 at 16–17. According to the medical evidence of record, however, these symptoms were consistent with leukemia. *See, e.g.,* Pl. Response to Def. Mot., Ex. 1 (Dr. Beverly Lange Dep.) at 36 (stating that fever may be a sign of infection or leukemia); Pl.

Mem. in Supp. of Partial Summ. J., Ex. 7 (Dr. Brumblay Dep.) at 14 (stating that Elena presented symptoms of leukemia at the emergency room, including persistent fever); Def. Mem. in Supp. of Summ. J., Ex. C (Dr. Parikh Dep.) at 22, 32–33 (stating that Elena presented symptoms of a cough and cold at the emergency room, but acknowledging that those symptoms were similar to that of leukemia at an early stage); *id.,* Ex. F (Dr. Silzovskaya Dep.) at 66 (stating that Elena's initial complaints of fever and cough could be attributed to a respiratory infection or leukemia).

The Fortis policy provides a policy holder with the "right to have the denial reviewed and reconsidered" by the company's "Appeal Review Committee." Policy at 11. Mr. Lawson appealed the denial. According to Marilyn Klein, the Fortis employee who handled the appeal, Fortis classifies appeals as either inquires or grievances. Pl. Mem. in Supp. of Partial Summ. J., Ex. 11 at 7. An appeal is classified as an inquiry if "the writer does not understand the basis for the decision that was made," while an appeal is classified as a grievance if the writer "understand[s] the basis for the decision, but ... dispute[s] it." *Id.* For an inquiry appeal, Fortis' practice was to review the initial determination and if the reviewer felt the decision was correct, to send the policy holder a detailed explanation. *Id.* at 8. A reviewer could, in her discretion, refer an inquiry to her supervisor, who could, in turn, refer it to a director. *Id.* Although the record is somewhat confusing regarding the processing of a grievance, it appears to allow for consideration of additional evidence and to encompass several potential levels of review, the highest of which is conducted by Fortis' Grievance Committee. *Id.* at 8, 25. Ms. Klein and a coworker determined that Mr. Lawson's

appeal was an inquiry because Mr. Lawson did not understand that Fortis' definition of preexisting coverage did not require a correct diagnosis of leukemia at the time of treatment, but "simply that the illness that is leukemia was treated by physicians" prior to the effective date of coverage. Pl. Mem. in Supp. of Partial Summ. J., Ex. 12 at 3. Fortis denied the appeal on this basis.

## II. Discussion [3]

Plaintiffs have moved for partial summary judgment on their breach of contract claim. Defendant has moved for summary judgment on the breach of contract claim and plaintiffs' bad faith claim.

### A. Breach of Contract

Plaintiffs argue that the policy is ambiguous and therefore, under Pennsylvania law, should be interpreted in their favor. Under plaintiffs' interpretation, because Elena received treatment for an upper respiratory infection and not for leukemia prior to the policy's effective date, the leukemia was not a preexisting condition.

On the other hand, defendant argues that the policy is not ambiguous and that Elena's visit to, and treatment at, the emergency room triggered the provisions of the preexisting condition exclusion. Accordingly, the court will first determine whether the preexisting exclusion is ambiguous.

 Interpretation of an insurance contract is generally for the court rather than the fact finder. *Standard Venetian Blind Co. v. Am. Empire Ins.*, 503 Pa. 300, 469 A.2d 563, 566 (Pa.1983).[4] "[T]he interpretation of the scope of coverage of an insurance contract ... [is] a question of law[.]" *McMillan v. State Mut. Life Assurance Co. of Am.*, 922 F.2d 1073, 1074 (3d Cir.1990). If the language of an insurance contract is clear and unambiguous, a court is required to enforce that language. *Id.* Moreover, a court should, if possible, interpret the policy to avoid ambiguities and give effect to all of its provisions. *Medical Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir.1999) (citation, punctuation omitted). On the other hand, if a contract is reasonably susceptible to more

---

**3.** Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter. Rather, it determines whether or not there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, all of the facts must be viewed in the light most favorable to, and all reasonable inferences must be drawn in favor of, the non-moving party. *See id.* at 256, 106 S.Ct. 2505.

The moving party has the burden of showing there are no genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 639 (3d Cir.1996). In response,

the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989). Rather, there must be evidence on which a jury could reasonably find for the nonmovant. *See Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

**4.** The parties agree that Pennsylvania law applies to this case.

than one interpretation, it is ambiguous. *Id.* Ambiguous provisions "must be construed against the insurer and in favor of the insured; any reasonable interpretation offered by the insured, therefore, must control." *Id.* at 104 (citation, punctuation omitted); *see also id.* (noting that "[t]his rule has been applied liberally in Pennsylvania"). Pennsylvania courts have offered two justifications for this rule of interpretation. First, insurance policies are contracts of adhesion between two unequal parties "and thus equity requires their interpretation in favor of the weaker party." *Id.* (citation, punctuation omitted). Second, the well-established rule of contract construction is that ambiguities are interpreted against the party who drafted it. *Id.*[5]

■ As noted previously, the policy defines a preexisting condition as:

A Sickness, Injury, disease or physical condition for which medical advice or treatment was recommended by a Physician or received from a Physician within the five (5) year period preceding that Covered Person's Effective Date of Coverage.

Policy at 3. The policy defines "Sickness" as: "An illness, disease or condition which is diagnosed or treated while this policy is in force." *Id.* The parties agree that Elena's leukemia was diagnosed and treated while the policy was in force. Therefore, according to the policy definition, the leukemia is a "Sickness."

The critical question, then, is whether "medical advice or treatment was recommended by a Physician or received from a Physician" *for* the leukemia. According to the plaintiffs, in order for Elena to receive advice or treatment for leukemia within the meaning of the preexisting condition exclusion, there must be some awareness that the treatment or advice was being provided for leukemia. On the other hand, Fortis argues that because the leukemia existed at the time Elena visited the emergency room, and the symptoms she displayed were consistent with leukemia, the advice and treatment she received was for the leukemia. In the defendant's view, it is immaterial that neither the emergency room doctor nor the plaintiffs had any suspicion that Elena had leukemia at that time. Essentially, defendant argues that the policy does not require that the preexisting condition be diagnosed, but simply requires that the policy holder receives medical advice or treatment for symptoms of the condition.

The interpretations of the policy's preexisting condition definition offered by both the plaintiffs and the defendant are reasonable. *See Hughes v. Boston Mut. Life Ins. Co.,* 26 F.3d 264, 269 (1st Cir.1994). Because the contract is reasonably susceptible to more than one interpretation, it is ambiguous. In holding that the language is ambiguous, the court finds *Hughes* instructive. Hughes was diagnosed with multiple sclerosis after his policy became effective. During the six months prior to his effective date of coverage, he visited

---

5. At oral argument, the defendant took the position that if the preexisting condition exclusion is ambiguous, then resolution of this ambiguity would be a matter for the jury. While this is the general rule, *e.g., Sanford Inv. Co. v. Ahlstrom Machinery Holdings,* 198 F.3d 415, 421 (3d Cir.1999), as noted, Pennsylvania has carved out an exception for ambiguous insurance contracts, requiring courts to construe ambiguities against the insurer

and in favor of coverage. For example, applying Pennsylvania law, the Third Circuit in *Medical Protective* reversed the district court's grant of summary judgment for the insurer. The *Medical Protective* court found that the insurance policy's exclusionary clause was ambiguous, interpreted the clause in favor of the insured, and held that the insured was covered by his policy. 198 F.3d at 104–106.

his doctor complaining of numbness in the lower extremities, loss of balance, and gastrointestinal problems. *Id.* at 266. The doctor treated the gastrointestinal condition, but did not diagnose multiple sclerosis at that time. *Id.* The court was faced with policy language similar to that at issue here: the *Hughes* policy defined a preexisting condition as "a sickness or injury for which the insured received treatment within 6 months prior to the insured's effective date."[6] *Id.* According to the defendant, this definition meant that "treatment 'for' a condition refers to treatment of any symptom which in hindsight appears to be a manifestation of the condition." *Id.* at 269. Hughes, on the other hand, offered a definition requiring "some awareness on the part of the physician or the insured that insured is receiving treatment for the condition itself." *Id.* Finding both interpretations reasonable, and applying the rule of construction that ambiguous terms are to be strictly construed against the insurer, the court adopted Hughes' interpretation. *Id.* at 268–70; *see also Ross v. Western Fidelity Ins. Co.*, 881 F.2d 142, 144 (5th Cir.1989) ("[T]here is at least a reasonable argument that ... treatment *for a specific condition* cannot be received unless the specific condition is known."); *Van Volkenburg v. Continental Cas. Ins. Co.*, 971 F.Supp. 117, 122 (W.D.N.Y.1997) ("[P]laintiff reasonably argues that to obtain advice or treatment regarding a medical 'condition', you must first have some awareness that the 'condition' exists."); *Mannino v. Agway Inc. Group Trust*, 192 A.D.2d 131, 600 N.Y.S.2d 723, 726 (2d Dept.1993) ("[I]t is arguable that any treatment or advice rendered prior to diagnosis could not be considered as having been given *for* that condition.").

In sum, Fortis' policy's definition of a preexisting condition, like the one at issue in *Hughes*, is reasonably susceptible to more than one interpretation. It can fairly be read either to require some awareness of preexisting condition at the time treatment or advice was provided, or to require simply that treatment or advice was rendered for symptoms of the condition, without a diagnosis of that condition. The court respectfully disagrees with those courts that have found similar policy language unambiguous. *See, e.g., Pitcher v. Principal Mut. Life Ins. Co.*, 93 F.3d 407, 409, 418 (7th Cir.1996) (holding that language defining a preexisting condition as "a sickness or injury for which a Member or Dependent is confined or received *treatment or service* in the 90–day period before he or she became insured under this policy" was not ambiguous);[7] *McWilliams v. Capital Telecommunications, Inc.*, 986 F.Supp. 920, 921 923–26 (M.D.Pa.1997) (holding that language defining a preexist-

---

6. In *Hughes*, the policy also defined "treatment" as "consultation, care or services provided by a physician including diagnostic measures and taking prescribed drugs and medicine." *Id.* at 266. Here, the policy does not provide a definition of treatment.

7. The Seventh Circuit's definition of a preexisting condition in *Pitcher* is closer to the interpretation offered by the plaintiffs than that offered by the defendant. Pitcher received treatment for a fibrocystic breast condition during the 90–day period before her insurance became effective. As a result of her treatment for the breast condition, Pitcher was diagnosed with, and treated for, breast cancer after the effective coverage date. *Pitcher*, 93 F.3d at 409. The court held that the preexisting condition definition unambiguously required that Pitcher receive treatment or service *for* breast cancer during the 90–day period and not that Pitcher merely had breast cancer during this period. *Id.* at 411, 418. Because the treatments Pitcher received during the exclusionary period were directed at the fibrocystic condition and "had nothing to do with breast cancer," *id.* at 412, the court found the defendant erred in denying coverage.

ing condition as "any Injury or Sickness for which an Employee either received medical treatment, services, or advice or took prescribed drugs or medicine ... prior to the date of coverage" was not ambiguous). Similarly, the court does not find that the adoption of a virtually identical preexisting condition definition by the Pennsylvania Insurance Commissioner, *see* 31 Pa.Code § 88.52, conclusively demonstrates that the definition is unambiguous.

The court is also not persuaded by those courts that have held that a preexisting condition clause must have language specifically requiring that the condition be diagnosed during the exclusionary period in order to be interpreted as requiring an awareness of the condition. *See, e.g., Kracht v. Aalfs Assocs. H.C.P.,* 905 F.Supp. 604, 614 (N.D.Iowa 1995) ("If the language of the policy does not require a diagnosis in order for the subsequent treatment of the illness to be excluded under the preexisting condition, the absence of a diagnosis is irrelevant."); *Fischman v. Blue Cross & Blue Shield,* 775 F.Supp. 513, 516 (D.Conn.1991) ("[B]y its terms [the clause] does not require that medical advice regarding or treatment of an extant condition must be recommended or undertaken after an accurate diagnosis of the condition in order for the condition to be excluded from coverage.")[8]; *Cury v. Colonial Life Ins. Co. of Am.,* 737 F.Supp. 847, 854 (E.D.Pa.1990) ("There is no requirement that a diagnosis, definite or otherwise, of the pre-existing condition must be made during the pre-existing condition period."). While it is reasonable to suggest that if the language of the policy does

not specify that a preexisting condition must be diagnosed, a requirement of diagnosis should not be inferred, it is also reasonable to read the policy as requiring an awareness of a condition in order to receive treatment or advice for that condition. *See Hughes,* 26 F.3d at 270 n. 5 ("[W]e obviously reject the reasoning of some other courts that have construed similar language by focusing exclusively on the absence of a requirement for diagnosis without seriously considering whether the language concerning treatment 'for' a particular condition is ambiguous."). As the drafter of the policy, the onus was on the defendant to avoid ambiguity. *See McMillan,* 922 F.2d at 1077 ("An insurer's failure to utilize more distinct language which is available reinforces a conclusion of ambiguity under Pennsylvania law."). If the defendant wished exclude coverage for conditions for which treatment and advice was received, regardless whether the condition was recognized by the patient or the doctor, it could have used more exact language.

The court rejects the defendant's argument that because the leukemia had manifested symptoms at the time Elena visited the emergency room, the leukemia should be considered a preexisting "sickness" under the policy. The defendant relies primarily on *Ranieli v. Mutual Life Insurance Company of America,* 271 Pa.Super. 261, 413 A.2d 396 (1979), to argue that a "sickness" occurs when "the disease first becomes manifest or active, or when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease."

---

**8.** In addition, *Fischman* is distinguishable because the phrase " 'in such a manner as would cause a reasonably prudent person to seek diagnosis, care, or treatment' " modified the definition of preexisting condition at issue in that case. *Id.,* 775 F.Supp. at 516. Relying on the modifying phrase, the court found

that the definition "clearly contemplates that reasonable and prudent persons will seek treatment while not knowing the correct diagnosis of their symptom and nonetheless have pre-existing conditions excluded by the Plan." *Id.*

*Id.* at 401; *see also* Def. Mem. of Law in Supp. of Mot. for Summ. J. at 6. In *Ranieli*, "sickness" was not a defined term in the policy and thus, the court went outside the policy in order to give meaning to the term. *Id.* at 400. Here, however, the defendant drafted a policy that sets forth a more limited definition of sickness—one that defines the onset of a sickness in terms of treatment and advice for that sickness and not in terms of when the disease manifests itself. The defendant gives no reason why the court should supplement the policy's definition with one in *Ranieli*, and the court declines to do so.

Moreover, as plaintiffs argue, *Ranieli* can be further distinguished in that the exclusion language at issue there is different from the language at issue here. The *Ranieli* policy limited coverage to a "sickness incurred during the term of the Policy which is contracted and begins after thirty days from the effective date of this Policy." 413 A.2d at 397. Thus, the *Ranieli* interpreted sickness in the context of ascertaining when it was contracted and began. *Id.* at 400. Here, the triggering event is when treatment or medical advice for the sickness is rendered or received.[9]

Because the policy's definition of a preexisting condition is ambiguous, the court adopts the interpretation offered by the plaintiffs: that in order to be treated

for leukemia, there must have been some awareness that the disease existed at the time treatment or advice was rendered. There is no dispute that when Elena visited the emergency room on October 7, 1998, no one suspected that she was suffering from the leukemia. The records indicate that Dr. Parikh diagnosed an upper respiratory infection and prescribed treatment accordingly. Because Elena did not receive advice or treatment that was directed to or concerned with leukemia during the exclusionary period, leukemia was not a preexisting condition. The defendant erred in denying coverage and the court grants summary judgment for the plaintiffs on the breach of contract claim.

## B. Bad Faith

In Pennsylvania, an insured may bring a cause of action against an insurer who has acted in bad faith. *See* 42 Pa.C.S.A. § 8371.[10] Bad faith has been defined as

> any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means breach of a known duty (i.e. good faith and fair dealing), through some motive of self-interest or ill will; mere

---

9. The court also rejects defendant's argument that this case is factually similar to *Bullwinkel v. New England Mutual Life Insurance Company*, 18 F.3d 429 (7th Cir.1994), which addressed a similar preexisting condition definition. Bullwinkel discovered a lump in her breast during the exclusionary period. Her physician did not make a definite diagnosis of cancer, but, concerned about that possibility, advised Bullwinkel to have the lump removed. After the effective date of coverage, the lump was removed and a biopsy revealed that the lump was cancerous. *Id.* at 430. The court found that it was reasonable to infer that the lump was cancerous prior to the date of coverage and that because the treat-

ment during the exclusionary period "concerned cancer," it was a preexisting condition. *Id.* at 432. Here, there is no dispute in the record that the treatment Elena received at the emergency room was not in any way concerned with cancer.

10. The statute provides that if an insurer is found to be in bad faith, the court may award interest on the amount of the claim from the date the claim was made, award punitive damages against the insurer, and assess court costs and attorney fees against the insurer. *See* 42 P.S. § 8371.

negligence or bad judgment is not bad faith. *Terletsky v. Prudential Property and Cas. Ins. Co.*, 437 Pa.Super. 108, 649 A.2d 680, 688 (1994).

In order to recover on a bad faith claim, a plaintiff must show both "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis" *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir.1997) (citing *Terletsky*, 649 A.2d at 688). Mere negligence on the part of insurer is insufficient to sustain a bad faith claim. *See Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 751 (3d Cir.1994).

Pennsylvania requires that an insurer act with the utmost good faith toward its insured, *see Romano v. Nationwide Mut. Fire Ins. Co.*, 435 Pa.Super. 545, 646 A.2d 1228, 1231 (1994), and it should "accord the interests of its insured the same faithful consideration it gives its own interest." *See Cowden v. Aetna Cas. and Surety Co.*, 389 Pa. 459, 134 A.2d 223, 228 (1957). However, an insurer is not required actively to submerge its own interest. *See Kosierowski v. Allstate Ins. Co.*, 51 F.Supp.2d 583, 588 (E.D.Pa.1999).

A plaintiff must establish bad faith by clear and convincing evidence. *See Polselli*, 23 F.3d at 750. Accordingly, in opposing a summary judgment motion, a plaintiff's burden of proof also rises to the clear and convincing standard. *See McCabe v. State Farm Mut. Auto. Ins. Co.*, 36 F.Supp.2d 666, 669 (E.D.Pa.1999).

In sum, in order to defeat a motion for summary judgment, a plaintiff must show that a jury could find by "the stringent level of clear and convincing evidence," *Jung v. Nationwide Mut. Fire Ins. Co.*, 949 F.Supp. 353, 356 (E.D.Pa.1997), that the insurer lacked a reasonable basis for denying the claim and that it recklessly disregarded its unreasonableness.

Although the court finds that Fortis erred in denying coverage, Fortis did not act in bad faith in doing so. As noted previously, Fortis' interpretation of the preexisting condition clause is reasonable. While the court rejects the defendant's position the clause can only be read to support its interpretation, other courts have agreed with the defendant that similar clauses are unambiguous. *See, e.g., Pitcher*, 93 F.3d at 409.[11]

Plaintiffs argue that Fortis acted in bad faith because, even under defendant's interpretation of preexisting condition, the record does not support its conclusion that Elena exhibited symptoms of leukemia when she was treated at the emergency room. However, the record reveals that while the various physicians who treated Elena or reviewed her medical records do not agree on the actual cause of her symptoms on October 7, there is a general agreement that those symptoms are consistent with leukemia. Even assuming that plaintiffs are correct and Elena's symptoms were caused by something other than leukemia, there was a medical basis for Fortis' position. Accordingly, plaintiffs have not established that the defendant acted unreasonably or recklessly denying

---

11. The court rejects plaintiffs' argument that Fortis did not take any legal position regarding the exclusion clause prior to this litigation. The record reveals that Fortis has consistently taken the position that the preexisting condition exclusion extends to treatment of a condition's symptoms, regardless of diagnosis. The fact that Dr. Brumley and the claims investigator did not consult with Fortis' legal department to ensure that their interpretation was in accordance with Pennsylvania law is not, as plaintiffs argue, clear and convincing evidence of bad faith.

coverage on the basis that Elena manifested the symptoms of, and therefore received treatment for, leukemia on October 7, 1998.

Finally, plaintiffs claim that Fortis' policy of classifying some appeals as inquiries, bypassing review by an appeals committee, constitutes bad faith because such a policy denied Mr. Lawson's "contractual right to an appeal." Pl. Mem. in Response to Def. Mot. at 12. According to the testimony of Ms. Klein, Fortis did review its decision to deny coverage at Mr. Lawson's request, and, consistent with its interpretation that a preexisting condition definition did not require diagnosis, upheld its denial. Given that the company conducted a reasonable review of the appeal, Fortis' failure to submit this appeal to an committee for review, as set forth in its policy, does not constitute clear and convincing evidence of bad faith.

The court grants summary judgment in favor of defendant on plaintiffs' bad faith claim.

III. Conclusion

Because the Fortis' policy is ambiguous, the court adopts the interpretation offered by the plaintiffs and finds that Elena's leukemia was not a preexisting condition. Defendant did not, however, act in bad faith in denying coverage.

An appropriate order follows.

### ORDER

**AND NOW**, this 20th day of June, 2001, upon consideration of the plaintiffs' motion for partial summary judgment (doc. 8) and the defendant's motion for summary judgment (doc. 12), the parties' responses, and after a hearing, it is **ORDERED** as follows:

1. Plaintiffs' motion is **GRANTED** and defendant's motion is **DENIED** as to count I.

2. Defendant's motion is **GRANTED** as to count II and count II is **DISMISSED** with prejudice.

3. The parties shall stipulate to the amount of the medical bills involved or submit a motion in that regard within 14 days.