**STATE FARM FIRE & CASUALTY COMPANY a/s/o Gary A. Bennett and Dennis Paul Bennett, a/s/o Robert Winn, a/s/o James And Marion Stotz, a/s/o Mark Pettigrow and James Witek, Appellant**

v.

**PECO (a/k/a Peco Energy), a Unit of Exelon Energy Delivery (a/k/a Exelon Corporation), Appellee.**

Superior Court of Pennsylvania.

Argued March 14, 2012.

Filed Oct. 3, 2012.

Raymond E. Mack, Blue Bell, for appellant.

John E. Salmon, Philadelphia, for appellee.

BEFORE: GANTMAN, SHOGAN and WECHT, JJ.

OPINION BY SHOGAN, J.:

Appellant State Farm Fire and Casualty Company ("State Farm"), as subrogee to claims of its insured subrogors, Gary A. Bennett, Dennis Paul Bennett, Robert Winn, James and Marion Stotz, Mark Pettigrow and James Witek, appeals from the trial court's March 23, 2011 orders denying State Farm's Motion for Partial Summary Judgment and granting Appellee PECO's Motion for Partial Summary Judgment. On appeal, State Farm challenges the trial court's interpretation of the limitation of liability clause found in Rule 12.1 of PECO's public utility tariff as restricting the amount of recovery by State Farm. For the reasons that follow, we affirm in part and vacate in part.

The trial court set forth the procedural and factual history as follows:

Around August 10, 2008, a "dangerous and defective" surge of electricity passed though the subrogors' home electric meters and caused significant damage to their houses. Defendant, PECO Energy Company ("PECO") asserts that the surge came from a bolt of lightning that struck a PECO facility and affected many residences in the subrogors' area. Pursuant to the subrogor's [sic] insurance policies, State Farm became subrogated to their clients' claims and filed suit against PECO for allowing an uncontrolled surge of electricity to reach the subrogors' homes. The Complaint, filed April 17, 2009, contained the following counts: Count I, negligence; Count II, strict liability; Count III, breach of contract; and Count IV, breach of warranty.[1]

In their Answer and New Matter, PECO asserted that Rule 12.1 of their Public Utility Tariff serves as a limitation of all of State Farm's claims. Rule 12.1 states in full:

12.1 LIMITATION ON LIABILITY FOR SERVICE INTERRUPTIONS AND VARIATIONS. The Company [PECO] does not guarantee continuous, regular and uninterrupted supply of service. The Company may, without liability, interrupt or limit the supply of service for the purpose of making repairs, changes, or improvements

in any part of its system for the general good of the service or the safety of the public or for the purpose of preventing or limiting any actual or threatened instability or disturbance of the system. The Company is also not liable for any damages due to accident, strike, storm, riot, fire, flood, legal process, state or municipal interference, or any other cause beyond the Company's control.

In all other circumstances, the liability of the Company to customers or other persons for damages, direct or consequential, including damage to computers and other electronic equipment and appliances, loss of business, or loss of production caused by any interruption, reversal, spike, surge or variation in supply or voltage, transient voltage, or any other failure in the supply of electricity shall in no event, unless caused by the willful and/or wanton misconduct of the Company, exceed an amount in liquidated damages equivalent to the greater of $500 or two times the charge to the customer for the service affected during the period in which such interruption, reversal, spike, surge or variation in supply or voltage, transient voltage, or any other failure of supply in electricity occurs. In addition no charge will be made to the customer for the affected service during the period in which such interruption, reversal, spike, surge or variation in supply or voltage, transient voltage, or any other failure in the supply of electricity occurs. A variety of protective devices and alternate power supplies that may prevent or limit such damage are available for purchase by the customer from third parties.

State Farm filed a motion for summary judgment on January 17, 2011 seeking a determination that Rule 12.1 is void as against public policy and PECO's tariff defense does not apply to their claims of negligence, strict liability, and breach of contract. PECO filed a competing motion on January 20, 2011, arguing that the tariff should not be voided as against public policy and that all of State Farm's claims are limited by Rule 12.1. This Court agreed with PECO, and accordingly issued Orders on March 23, 2011. State Farm has filed motions to certify for interlocutory appeal the Order denying their motion and the Order granting PECO's motion.

[1] Originally, the only subrogors in this case were the Bennetts. On September 22, 2010, the parties stipulated to amend the caption and the complaint to reflect the addition of several of the Bennetts' neighbors, the additional named subrogors. The Amended Complaint reflecting the additions was filed on October 18, 2010, but the substance of the claims was not changed.

Trial Court Opinion, 7/20/11, at 1–3.

On May 19, 2011, the trial court certified its orders for immediate appeal pursuant to Pa.R.A.P. 341(c). State Farm presents the following issues for this Court's consideration on appeal:

(a) Whether PECO's Tariff's Rule 12.1, which, according to express terms, purports to shield PECO from any liability whatsoever for any damages caused by its own negligent and/or liability-producing conduct, is an exculpatory clause that is void as against public policy as a matter of law.

(b) Whether PECO's Tariff applies to Plaintiff/Appellant's causes of action in strict liability because PECO did not specifically disclaim strict liability in its Tariff as required by Pennsylvania law.

Appellant's Brief at 6.

Our standard of review of a trial court's order granting or denying summary judgment is as follows:

A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. . . .

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. . . . [W]e will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Murphy v. Duquesne Univ. of The Holy Ghost*, 565 Pa. 571, 777 A.2d 418, 429 (2001) (citations omitted). "When reviewing whether there are genuine issues of material fact, this Court's standard of review is *de novo;* we need not defer to determinations made by lower courts; and our scope of review is plenary." *Gleason v. Borough of Moosic*, 609 Pa. 353, 15 A.3d 479, 484 (2011). Insofar as State Farm challenges the denial of its motion seeking summary judgment, we must view the record in a light most favorable to PECO, as the non-moving party.

While the trial court has provided a succinct recitation of the facts and procedural history of this action, the uninitiated reader would be served by a brief discussion of the legal posture of this matter. We begin by noting that this Commonwealth's Public Utility Commission ("PUC") plays a unique role in the regulation of public utilities (like PECO) in the Commonwealth. Indeed, this Court has discussed previously the scope of the PUC's jurisdiction as follows:

The extent of the PUC's jurisdiction has been clearly outlined by the courts of this Commonwealth in the course of a long series of opinions. In *Lansdale Borough v. Philadelphia Electric Co.*, 403 Pa. 647, 650–51, 170 A.2d 565, 567 (1961) the Supreme Court, after an extensive review of prior cases concerning PUC jurisdiction, concluded: 'Initial jurisdiction in matters concerning the relationship between public utilities and the public is in the PUC-not in the courts. It has been so held involving rates, service, rules of service, extension and expansion, hazard to public safety due to use of utility facilities, installation of utility facilities, location of utility facilities, obtaining, alerting, dissolving, abandoning, selling or transferring any right, power, privilege, service, franchise or property and rights to serve particular territory.' The exclusive regulatory jurisdiction conferred on the PUC in these areas permits evaluation and control of utility activities as they affect public service. No other entity can interfere with the commission's performance of its function by making additional or different requirements of a utility or by conducting an independent appraisal of a utility's service to the public.

The question of utility policy as it affects the public is not now before this court, nor is the determination of the reasonableness or adequacy of Bell's methods of providing service. This is an action for damages and the fact that the regulation of utility service is exclusively in the PUC's jurisdiction does not remove from the court's jurisdiction an action for damages based on a failure of service, any more than the PUC's power to promulgate safety regulations prohibits the courts from hearing a claim for personal injuries resulting from unsafe utility equipment. The commission's jurisdiction is limited to regulatory matters essential to utility service. **The courts retain jurisdiction of a suit for dam-**

**ages based on negligence or breach of contract wherein a utility's performance of its legally imposed and contractually adopted obligations are examined and applied to a given set of facts.**

*Behrend v. Bell Tel. Co.*, 242 Pa.Super. 47, 363 A.2d 1152, 1157–1158 (1976) (some citations omitted and emphasis added). Thus, the matter is properly before our courts. *Id.*

Turning to the matter in controversy, namely whether Rule 12.1 of PECO's tariff constitutes a valid limitation of liability,[1] we note that the Public Utility Code defines a utility's "tariff" as "All schedules of rates, all rules, regulations, practices, or contracts involving any rate or rates, including contracts for interchange of service. . . ." 66 Pa.C.S.A. § 102. Our sister Court has explained tariffs as follows:

> A tariff is a set of operating rules imposed by the State that a public utility must follow if it wishes to provide services to customers. It is a public document which sets forth the schedule of rates and services and rules, regulations and practices regarding those services. It is well settled that public utility tariffs must be applied consistently with their language. 66 Pa.C.S. § 1303. **Public utility tariffs have the force and effect of law, and are binding on the customer as well as the utility.** *Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission*, 663 A.2d 281, 284 (Pa.Cmwlth.1995).

*PPL Elec. Utilities Corp. v. Pennsylvania Public Utility Com'n*, 912 A.2d 386, 402 (Pa.Cmwlth.2006) (emphasis added). With this as the legal backdrop, we proceed to discuss the merits of State Farm's issues on appeal.

In support of its first issue, State Farm claims that Rule 12.1 of PECO's tariff is exculpatory because it "expressly shields PECO from all liability for damages no matter their cause." Appellant's Brief at 11. Based on this Court's analysis and holding in *DeFrancesco v. W. Pa. Water Company*, 329 Pa.Super. 508, 478 A.2d 1295 (1984) where we proscribe exculpatory clauses within a tariff as void against public policy, Appellant concludes that PECO's tariff is likewise void. *Id.* (citing *DeFrancesco*, 478 A.2d at 1306). We disagree.

Several years before its decision in *DeFrancesco*, this Court had occasion to review the limitation of liability provisions contained within a defendant telephone company's tariff. *Behrend v. Bell Telephone Company*, 242 Pa.Super. 47, 363 A.2d 1152 (1976), *vacated on other grounds*, 473 Pa. 320, 374 A.2d 536 (1977). In *Behrend*, we were asked to determine whether the following tariff provision limiting Bell's liability was void as against public policy:

> The liability of the Telephone Company for damages arising out of failure to comply with a customer's direction to install, restore or terminate service, or mistakes, omissions, interruptions, delays, or errors or defects in transmission, or failure or defects in the Telephone Company's equipment (facilities) occurring in the course of furnishing service and not caused by the negligence of the customer . . . shall in no event exceed an amount equivalent to the proportionate charge to the customer for the period of service during which such failure, mistake, omission, interruption, delay, or error or defect in transmission, or failure or defect in the Telephone Company's equipment (facilities) occurs.

---

1. There is no dispute that Rule 12.1 is part of PECO's overall tariff.

The Telephone Company, except as provided herein, shall not be liable for damage claimed on account of errors in or omission from its directories nor for the result of the publication of such errors in the directory.... Claim for damages on account of interruptions to service due to errors in or omissions of directory listings will be limited to an amount equivalent to the proportionate charge for that part of the customer's service which is impaired, but not to exceed one-half the local service charges for the service items affected for the period from the date of issuance of the directory in which the mistake occurred to the date of issuance of a new directory containing the proper listing.

*Behrend,* 363 A.2d at 1163.

In concluding that the foregoing limitation of liability clause was valid and enforceable, we recognized the PUC's authority to determine the reasonableness of tariffs as well as its power to assess whether such provisions are "compatible with the [Public Utility C]ode and policies of the commission and consistent with its regulatory scheme." *Behrend,* 363 A.2d at 1166. Deferring to the PUC's authority, and observing that the tariff had been properly filed with the PUC, we held that the limitation of liability provisions must be enforced. *Id.*

Appellant correctly directs that this Court, in *DeFrancesco,* reached the opposite conclusion with respect to the defendant water company's limitation of liability clause found in its tariff. Appellant's Brief at 15. However, in *DeFrancesco,* the Court was confronted with a limitation of liability clause patently different from that proffered in *Behrend.* Specifically, the limitation of liability clause in *DeFrancesco* stated:

Liability of Company

(a) The Company **shall not in any way or under any circumstances be held responsible** to any person or persons for **any loss or damage for any deficiency** in the pressure, volume or supply of water **due to any cause whatsoever.** The Company will undertake to use reasonable care and diligence in order to prevent and avoid interruptions and fluctuations in the service, but it cannot and does not guarantee that such will not occur.

(b) The Company shall in no event be liable for any damage or inconvenience caused by reason of any break, leak or defect in the Customer's service pipe or fixtures.

*DeFrancesco,* 478 A.2d at 1305 (Spaeth, J., concurring opinion) (emphasis added).[2] Because the limitation of liability clause in *DeFrancesco* disclaimed **all** liability, we held that it was exculpatory and continued our review, concluding that such a clause was void as against public policy. *See id.* at 1307 (reasoning that "it was the trial court's responsibility initially, and ours on appeal, to determine the validity of [limitation of liability provision] as an exculpatory clause").

Reading *Behrend* and *DeFrancesco* together, we glean a legal framework within which to assess the validity of clauses purporting to limit a utility company's liability. A clause which limits but which does not entirely exempt a utility from liability is enforceable and will not be void on public policy grounds. *Behrend,* 363 A.2d at 1166. Conversely, a clause which is truly exculpatory in nature, in other words, one which absolves the utility

---

**2.** Although discussion concerning the validity of the defendant utility company's liability limitation clause appears in Judge Spaeth's concurring opinion, the analysis was adopted explicitly within the majority opinion. *DeFrancesco,* 478 A.2d at 1299.

of **all** liability, is void as against public policy. *DeFrancesco,* 478 A.2d at 1307. Although tariffs have the "force and effect of law," they are not statutes subject to statutory interpretation. *See Equitable Gas Co. v. Wade,* 812 A.2d 715, 718 (Pa.Super.2002) (holding that because gas company's tariff was not enacted by the Pennsylvania legislature, it was not a statute under Pennsylvania law). Accordingly, in order to properly measure scope of PECO's clause limiting its liability, we must rely on rules of contract interpretation. *See DeFrancesco,* 478 A.2d at 1306–1307 (applying Section 195 of the Restatement (Second) of Contracts to determine whether tariff's limitation of liability clause is exculpatory).

When interpreting the language of a contract, the intention of the parties is a paramount consideration. *Thomas Rigging & Constr. Co., Inc. v. Contraves, Inc.,* 798 A.2d 753, 755 (Pa.Super.2002). "In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly." *Meeting House Lane, Ltd. v. Melso,* 427 Pa.Super. 118, 628 A.2d 854, 857 (1993), appeal denied, 537 Pa. 633, 642 A.2d 486 (1994) (citations omitted).

When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent. *Osial v. Cook,* 803 A.2d 209, 213 (Pa.Super.2002). The language of a contract is unambiguous if we can determine its meaning "without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." *Baney v. Eoute,* 784 A.2d 132, 136 (Pa.Super.2001). "When terms in a contract are not defined, we must construe the words in accordance with their natural, plain, and ordinary meaning." *Cordero v. Potomac Ins. Co. of Illinois,* 794 A.2d 897, 900 (Pa.Super.2002). As the parties have the right to make their own contract, we will not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used. *Meeting House Lane, Ltd.,* 628 A.2d at 857.

On the contrary, the terms of a contract are ambiguous if the terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense. *Cordero,* 794 A.2d at 900. Additionally, we will determine that the language is ambiguous if the language is "obscure in meaning through indefiniteness of expression or has a double meaning." *Baney,* 784 A.2d at 136. Where the language of the contract is ambiguous, the provision is to be construed against the drafter. *Cordero,* 794 A.2d at 900.

*Profit Wize Marketing v. Wiest,* 812 A.2d 1270, 1274–1275 (Pa.Super.2002).

Turning to PECO's Rule 12.1, we note that the following portions require this Court's consideration:

**12.1 LIMITATION ON LIABILITY FOR SERVICE INTERRUPTIONS AND VARIATIONS.**

\* \* \*

**The Company is also not liable for any damages due to accident,** strike, storm, riot, fire, flood, legal process, state or municipal interference, **or any other cause beyond the Company's control.**

\* \* \*

▪▪▪ **In all other circumstances, the liability of the Company to customers** or other persons for damages, direct or consequential, including damage to com-

puters and other electronic equipment and appliances, loss of business, or loss of production caused by any interruption, reversal, spike, surge or variation in supply or voltage, transient voltage, or any other failure in the supply of electricity **shall in no event, unless caused by the willful and/or wanton misconduct of the Company, exceed an amount in liquidated damages equivalent to the greater of $500 or two times the charge to the customer for the service affected during the period in which** such interruption, reversal, spike, surge or variation in supply or voltage, transient voltage, or any other **failure of supply in electricity occurs.** Plaintiff's Motion for Partial Summary Judgment, 9/13/10, at Exhibit D, ¶ 12.1 (emphasis added). The first paragraph clearly precludes PECO's liability to State Farm for damages attributable to "accidents" or "cause[s] beyond [PECO]'s control." Despite State Farm's claims to the contrary, this clause does not resemble the exculpatory clause found in *DeFrancesco.* In particular, we note that this Court long ago opined the definition of the term "accident" as follows:

An accident has been defined as follows (quoting from the opinion of Mr. Justice Drew) in *Lacey v. Washburn & Williams Co.,* 309 Pa. 574, 164 A. 724, 725: "The word 'accident,' as used in the act, must be interpreted in its usual, ordinary, popular sense. Webster has defined it as 'an event that takes place without one's foresight or expectation; an undesigned, sudden, and unexpected event; chance; contingency.' * * * That which distinguishes an accident from other events is the element of being unforeseen; an accident is an occurrence which proceeds from an unknown cause, or which is an unusual effect of a known cause, and hence unexpected and unforeseen. The death of an employee, unless it is the result of some untoward happening, not expected or designed, a mishap or fortuitous happening, aside from the usual course of events, is not compensable under our statute."

*Fesenbek v. City of Philadelphia,* 144 Pa.Super. 99, 18 A.2d 448, 450 (1941). Our Supreme Court, in discussing this definition of the term "accident," noted, "It seems clear that an accident is the antithesis of something likely to occur, foreseeable in due course." *Casper v. American Guarantee & Liability Ins. Co.,* 408 Pa. 426, 431, 184 A.2d 247, 249 (1962).

In this case, defining what is **not** precluded by the liability limitation clause is as important as what it does preclude. Based on the above definition of "accident," we conclude that the clause does not preclude recovery for the antithesis of an accident; namely, it does not proscribe events that are foreseeable. Indeed, "the foreseeability of the harm is an element of negligence." *Pegg v. General Motors Corp.,* 258 Pa.Super. 59, 391 A.2d 1074, 1085 (1978) (citing *Noon v. Knavel,* 234 Pa.Super. 198, 339 A.2d 545, 550 (1975)). Moreover, to the extent that the limitation of liability only precludes recovery for damages caused "outside [PECO's] control," recovery for damages attributable to causes within PECO's control remain justiciable. Because PECO's liability limitation clause does not preclude **all** claims against it, it is readily distinguishable from the clause found in *DeFrancesco,* and thus, is not exculpatory.

The second paragraph establishes two scenarios which serve solely to limit the amount of recovery. Under the default scenario, the amount of recovery is the liquidated amount of $500 or "two times the charge to the customer for the service affected during the period in which such interruption ... or any other failure of

supply in electricity occurs," whichever is greater. Plaintiff's Motion for Partial Summary Judgment, 9/13/10, at Exhibit D, ¶ 12.1. However, if State Farm can prove that the damage to the subrogors' property was caused by PECO's "willful and/or wanton misconduct," the limitation on recovery is not implicated and State Farm is entitled to the recovery of those damages it may prove. Therefore, while Rule 12.1's second paragraph may limit the amount of recovery, such does not amount to an exculpatory clause absolving PECO from all liability. Consequently, we agree with the trial court in this regard.[3]

 In support of its second issue on appeal, State Farm claims the trial court erred in concluding that Rule 12.1 of PECO's tariff disclaims any liability from claims sounding in strict liability. Appellant's Brief at 23. State Farm relies, in part, on this Court's decision in *Schriner v. Pa. Power & Light Co.*, 348 Pa.Super. 177, 501 A.2d 1128 (1985), wherein we narrowly held:

> if electricity "in a defective condition, unreasonably dangerous" passes through the meter of a user or consumer and into the stream of commerce, causing physical harm to the ultimate user or consumer, or to his property, the doctrine of strict liability in tort may be applied against the public utility which "engaged in the business of selling such a product," which product "[was] expected to and [did] reach the user or consumer without substantial change in the condition in which it was sold." Restatement (Second) of Torts § 402A(1).

*Schriner*, 501 A.2d at 1134. State Farm essentially argues that, because this Court recognizes strict liability as a cognizable cause of action against a utility company, PECO must expressly disclaim the same in order to avoid defending against the claim on the merits. Appellant's Brief at 29–31.

The trial court, for its part, cursorily concludes that while "Rule 12.1 does not **literally** disclaim strict liability, its provisions reach widely enough to encompass strict liability. . . ." Trial Court Opinion, 7/20/11, at 8 (emphasis added). In reaching its conclusion, the court notes that "State Farm has cited no applicable case which holds that the principles of strict liability usurp the PUC as the supreme law of the land." We are constrained to conclude that the trial court's analysis on this point is fundamentally mistaken. Irrespective of whether the PUC's regulations, and the tariffs which it approves, have the effect of law, the court must nevertheless determine whether the limitation of liability clause found in those tariffs disclaims the particular cause of action sought by the plaintiff. Because we have previously held that a party may pursue a strict liability claim against an electricity provider, *Schriner*, 501 A.2d at 1134, the inquiry turns to whether the utility has disclaimed that form of liability.

The court is constrained to determine whether PECO's tariff expressly disclaims "strict liability" or in some fashion articulates a disclaimer addressing our holding in *Schriner*. The trial court readily acknowledges that Rule 12.1 does not expressly disclaim strict liability. Trial Court Opinion, 7/20/11, at 8. However, in

---

3. We observe that State Farm claims that Rule 12.1 is void insofar as it limits PECO's financial exposure to $500.00, "thus essentially immuniz[ing] PECO from all tort liability." However, whether $500.00 or any particular amount is an appropriate limitation on recovery constitutes a question of reasonableness and is better suited for the PUC's consideration. *See DeFrancesco*, 478 A.2d at 1295 ("To determine the reasonableness of a limitation of liability requires striking a balance of 'benefits and burdens' *see Behrend I*, 242 Pa.Super. at 73, 363 A.2d at 1165, and to do that requires the PUC's expertise in ratemaking; the benefit of low rates is balanced against the burden of limited recovery").

concluding that Rule 12.1 nonetheless disclaims strict liability, the court merely concludes "its provisions reach widely enough to encompass strict liability...." *Id.* Limited by our rules of contract interpretation, *Profit Wize Marketing,* 812 A.2d at 1274–1275, we must disagree with the trial court's conclusion.

For PECO's tariff to disclaim strict liability, Rule 12.1 must include some language purporting to disclaim liability for electricity which "[was] expected to and [did] reach the user or consumer without substantial change in the condition in which it was sold" and for electricity which possessed "a defective condition, unreasonably dangerous." *Schriner,* 501 A.2d at 1134. Furthermore, we cannot agree with the trial court that the tariff provisions "reach widely enough to encompass strict liability." Trial Court Opinion, 7/20/11, at 8. To the contrary, they address whether **the cause was beyond the Company's control** and the foreseeability of the harm. As noted previously, foreseeability of harm is an element of negligence. *Pegg,* 391 A.2d at 1085. It is not, however, required for a cause of action sounding in strict liability. *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 97, 337 A.2d 893, 900 (1975). Insofar as Rule 12.1 is limited in its expression to harm which is and is not foreseeable, it cannot be read to further exculpate claims of strict liability. Because we conclude that Rule 12.1 does not disclaim a strict liability cause of action and we have previously held that a party may pursue the same against a utility company, we vacate the trial court's order to the extent that it precludes State Farm from pursuing its strict liability claim.

Orders affirmed in part and vacated in part. Case remanded with instruction. Jurisdiction relinquished.

WECHT, J., files a Concurring and Dissenting Opinion.

## CONCURRING AND DISSENTING OPINION BY WECHT, J.

I join the learned majority in its determination that the limitation of liability contained in PECO Energy Co. ("PECO")'s tariff fails to disclaim PECO's exposure to claims in strict product liability. However, the majority also concludes that the limitation of liability as a whole is not an exculpatory clause, and that the clause therefore is enforceable. With this conclusion, I am constrained to disagree. After close review, I find the clause exculpatory in its effect, and therefore void as against public policy. Accordingly, I respectfully dissent from the majority's ruling on that issue.

I begin by incorporating by reference the majority's thorough discussion of the factual and procedural background of this case, as well as its interpretation and articulation (albeit not its application) of our holdings in *Behrend v. Bell Tel. Co.,* 242 Pa.Super. 47, 363 A.2d 1152, 1157–58 (1976), and *DeFrancesco v. Western Pennsylvania Water Co.,* 329 Pa.Super. 508, 478 A.2d 1295 (1984). *See* Maj. Op. at 923–28. I agree with the trial court, the parties, and the majority that State Farm Fire & Casualty Company ("Appellant")'s first issue must be decided principally in such light as is shed by our prior decisions in *Behrend* and *DeFrancesco.* Notwithstanding my reliance on the majority's discussion of these cases, a brief review is necessary to establish the basis for my disagreement with the majority's ruling.

In *Behrend,* this Court, noting that the validity of limitation of liability clauses in a utility's tariff had yet to be addressed by any Pennsylvania appellate court, surveyed other jurisdictions to establish an analytic framework. 363 A.2d at 1164–66. We held:

[T]he tariffs setting rates and limiting liability ... have the force of law and

their reasonableness is to be determined by the [Commonwealth's Public Utility Commission ("PUC")]. [PUC's] exclusively granted supervisory and regulatory powers and its special expertise are thought to designate it the exclusive body to consider questions relating to regulation and structure of the utilities and service to the consumer. Therefore, [PUC] is the appropriate body to evaluate the tariffs filed with it and determine their reasonableness, fairness and consistency with established policies. The courts' jurisdiction in considering issues which involve public utilities and the regulation thereof is in "aid and not in derogation of the jurisdiction of the commission," and thus requires the application of the [PUC-]approved tariffs to the facts of the given case.

*Id.* at 1164–65 (quoting *Waters v. Pac. Tel. Co.*, 12 Cal.3d 1, 114 Cal.Rptr. 753, 759, 523 P.2d 1161 (1974)). The Court concluded that, because Bell's tariff was properly filed under the law, and did not categorically disclaim all liability, the Court was bound to "enforce its provisions as they apply to both Bell and its customer." *Id.* at 1166. This Court proposed only the following restrictions on the forms of liability that Bell Telephone Co. permissibly could limit or disclaim: "[T]he limitation in the tariff is not enforceable if the damage is caused by willful or wanton conduct by Bell. The weight of authority supports interpreting the tariff limitations to extend only to acts of ordinary negligence and exclude conduct found to be willful, malicious, or reckless." *Id.*

Later, in *DeFrancesco*, we narrowed *Behrend's* holding. Rule 17 of the defendant water company's tariff in *DeFrancesco* provided as follows:

*Liability of Company*

(a) The company shall not in any way or under any circumstances be held responsible to any person or persons for any loss or damage for any deficiency in the pressure, volume or supply of water due to any cause whatsoever. The Company will undertake to use reasonable care and diligence in order to prevent and avoid interruptions and fluctuations in the service, but it cannot and does not guarantee that such will not occur.

(b) The Company shall in no event be liable for any damage or inconvenience caused by reason of any break, leak or defect in the Customer's service pipe or fixtures.

*DeFrancesco*, 478 A.2d at 1305 (Spaeth, J., concurring, joined on this issue by the majority). This Court recognized the *Behrend* holding as entrusting to PUC the prerogative to "evaluate the reasonableness of tariffs," but distinguished the limitation clause before it from the clause in *Behrend*:

[W]hile [*Behrend*] involved what was clearly a limitation of liability, this case involves what is just as clearly an exculpatory clause.... **To determine the reasonableness of a limitation of liability requires striking a balance of benefits and burdens, and to do that requires PUC's expertise in ratemaking: the benefit of low rates is balanced against the burden of limited recovery. However, the determination of the validity of an exculpatory clause, which absolves the utility from all liability, is not an inquiry peculiarly within PUC's expertise, but rather one that courts are familiar with.** Accordingly, while we continue to recognize the authority of PUC to determine the reasonableness of rates, which determination includes the determination of the reasonableness of a limitation of liability, we believe that it was the trial court's responsibility initially, and ours

on appeal, to determine the validity of Rule 17 as an exculpatory clause.

*DeFrancesco,* 478 A.2d at 1306 (citations and internal quotation marks omitted; emphasis added).

We then quoted the Restatement (Second) of Contracts § 195 for the proposition that "[a] term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if ... the term exempts one charged with a duty of public service from liability to one to whom that duty is owed for compensation for breach of that duty." *DeFrancesco,* 478 A.2d at 1306.[1] We held that Section 195 "is a correct statement of the public policy of the Commonwealth." *Id.* (citing *Warren City Lines, Inc., v. United Refining Co.,* 220 Pa.Super. 308, 287 A.2d 149 (1971)). In *Warren City Lines,* which involved the purported transfer of liability by contractual agreement between private parties, we expressed concern that an exculpatory clause eliminates any incentive for the risk-transferring party to use reasonable care. "This creates a particularly dangerous situation for the public where 1) the party transferring the risk is better able to prevent loss or reduce the risk associated with loss, or 2) where the party to whom the risk has been transferred does not fully realize the responsibility which it has received." *Id.* at 151–52. We found the private-party circumstance in *Warren City* analogous to the water utility situation in *DeFrancesco,* noting 1) the lack of incentive to ensure an adequate water supply without the threat of liability for damages; 2) that the utility owned and had exclusive responsibility for maintenance and repair of its facilities; and 3) that "it was doubtful that [the utility's] customers were generally aware of its exculpatory clause and ... knew of their purported responsibility for damages caused by an inadequate water supply." *DeFrancesco,* 478 A.2d at 1307. Consequently, we found Rule 17 void as against public policy.

Turning to Rule 12.1, I restate the limitation of liability for ease of reference:

**12.1 LIMITATION ON LIABILITY FOR SERVICE INTERRUPTIONS AND VARIATIONS.** [PECO] does not guarantee continuous regular and uninterrupted supply of service. The Company may, without liability, interrupt or limit the supply of service for the purposes of making repairs, changes, or improvements in any part of its system for the general good of the service or the safety of the public or for the purpose of preventing or limiting any actual or threatened instability or disturbance of the system. The Company is also not liable for any damages due to accident, strike, storm, riot, fire, flood, legal process, state or municipal interference, or any other cause beyond the Company's control.

In all other circumstances, the liability of the Company to customers or other persons for damages, direct or consequential, including damage to computers and other electronic equipment and appliances, loss of business, or loss of production caused by any interruption,

---

1. The commentary to Section 195 also appears to allow for limitations of liability incorporating the sort of balancing we have entrusted to PUC:

 [O]ne who is charged with a duty of public service, such as ... a public utility ... is not permitted to exempt himself from liability to the one to be served for negligent breach of that duty.... The rigor of this rule may, however, be mitigated by a fairly bargained for agreement to limit liability to a reasonable agreed value in return for a lower rate.

 Restatement (Second) of Contracts § 195, Cmt. a.

reversal, spike, surge or variation in supply or voltage, transient voltage, or any other failure in the supply of electricity shall in no event, unless caused by the willful and/or wanton misconduct of the Company, exceed an amount in liquidated damages equivalent to the greater of $500 or two times the charge to the customer for the service affected during the period in which such interruption, reversal, spike, surge or variation in supply or voltage, transient voltage, or any other failure of supply in electricity occurs. In addition no charge will be made to the customer for the affected service during the period in which such interruption, reversal, spike, surge or variation in supply or voltage, transient voltage, or any other failure in the supply of electricity occurs. A variety of protective devices and alternate power supplies that may prevent or limit such damage are available for purchase by the customer from third parties.

*Behrend* and *DeFrancesco* thus establish a two-step interpretive framework for assessing the effect of a PUC approved tariff: a first round to assess whether a tariff's effect is exculpatory and thus *per se* unenforceable in the context of a utility's tariff seeking to limit liability; and, if it is not, a second stage to determine the effect of the limitation of liability clause on the claims presented.

The first portion of the first paragraph of Rule 12.1, ending with "disturbance of the system," plainly is exculpatory, but only as to damages incurred as a consequence of interruptions or limitations of supply. The critical second part of the first paragraph excludes liability categorically for "any damages due to accident, strike, storm, riot, fire, flood, legal process, state or municipal interference, or any other cause beyond the Company's control." This section purports to preclude all liability arising from the enumerated events and contingencies, and hence is exculpatory in its domain.

Only the second paragraph purports to provide limited compensation that more closely resembles the formulaic damages provided by the limitation clause at issue in *Behrend*—ostensibly, for those events not encompassed in the first, exculpatory paragraph. In light of the sweep of the first paragraph, particularly its last sentence, Appellant argues that this second paragraph is no more than window-dressing designed to disguise the exculpatory intent and effect of the provision taken as a whole. Brief for Appellant at 18.

It is noteworthy that PECO makes no effort to reconcile or integrate Rule 12.1's first paragraph with its second. Instead, PECO repeatedly references its second-paragraph carve-out for damages caused by "willful and/or wanton misconduct." PECO discusses the exception as though it is a matter of grace rather than a form of liability that the law precludes PECO from disclaiming. The majority chooses to grant PECO the benefit of this hollow argument. Maj. Op. at 929–30 (citing the willful and/or wanton language and concluding that, "[t]herefore, while Rule 12.1's second paragraph may limit the amount of recovery, such does not amount to an exculpatory clause").

*Behrend,* however, held that such liability **cannot** be disclaimed even by an otherwise valid limitation clause. 363 A.2d at 1166. Put simply, the "willful and/or wanton" exclusion offers the consumer no right to recover that he does not already have as a matter of settled Pennsylvania law, and by itself is immaterial to the analysis of the limitation clause's exculpatory character. Reinforcing this point, the limitation in *DeFrancesco* was deemed exculpatory despite the enduring availability, as a mat-

ter of law, of damages arising from willful or wanton misconduct. *See Behrend, supra.* Thus, the explicit allowance of damages for willful and/or wanton misconduct, which is gratuitous in any event, **cannot save, without more, an otherwise exculpatory limitation on liability from being deemed unenforceable.**

The majority, finding that Rule 12.1 is not exculpatory as a matter of law, proposes that the proper application of Rule 12.1 in this case be resolved by resort to contract interpretation principles, and particularly pursuant to the Restatement (Second) of Contracts § 195. Maj. Op. at 935–36. I agree.

The intent of the parties to a contract governs our interpretation of the contract. The best indicator of the parties' intent is found in the language of the instrument, provided it is clear and unambiguous. *See Certain Underwriters at Lloyds v. Hogan,* 852 A.2d 352, 354 (Pa.Super.2004) ("Generally, courts are to go no further than the plain meaning of the contract language."); *Ranieli v. Mut. Life Ins. Co. of Amer.,* 271 Pa.Super. 261, 413 A.2d 396, 400 (1979); Maj. Op. at 927–28.

The same is not true, however, when the language of the contract is ambiguous.

> The terms of a contract are ambiguous when the terms of a contract are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense.... [T]he language is ambiguous if the language is obscure in meaning through indefiniteness of expression or has a double meaning.

*Profit Wize Marketing v. Wiest,* 812 A.2d 1270, 1275 (Pa.Super.2002) (internal quotation marks and citations omitted). When we are confronted with ambiguous language, we must construe that language in favor of the non-drafting party. *Id.*

Similarly, when a contract is one of adhesion, we must construe ambiguities in that contract strictly in favor of the party disadvantaged by the contract's adhesive nature—in this case, Appellant's consumer subrogors. *See, e.g., Ranieli,* 413 A.2d at 400 ("[I]t is well settled that insurance policies are in essence contracts of adhesion, and consequently any ambiguities or uncertainties in language are construed strictly against the insurer and in favor of coverage," *i.e.,* in favor of the insured as the party with effectively no bargaining power); *Chepkevich v. Hidden Valley Resort, L.P.,* 607 Pa. 1, 2 A.3d 1174, 1189 (2010) (quoting *Topp Copy Prods., Inc., v. Singletary,* 533 Pa. 468, 626 A.2d 98, 99 (1993)) (holding that, among the three criteria that a private-party exculpatory clause must satisfy to be valid, "each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion"). An adhesion contract is "[a] standard-form contract prepared by one party, to be signed by the party in a weaker position, [usually a] consumer, who has little choice about the terms." *See* Black's Law Dictionary 318–19 (7th ed.); *accord Chepkevich,* 2 A.3d at 1190.

With these well-established principles of contract interpretation in mind, I turn to the disclaimer at issue herein. First, I believe it to be indisputable that the tariff at issue is a contract of adhesion, inasmuch as it fits the textbook definition perfectly. There can be no question that utility companies employ form tariffs, and that these will not be revised at a customer's request. Unless an individual of a Luddite bent prefers to live as he might have done a century or more ago, he has little choice but to accept the terms that the utility places before him.

My belief that the tariff at issue in this case is ambiguous requires more development, which is the subject of the detailed

textual analysis and discussion that follow. The net result of my observations, however, is that I would construe the ambiguous terms of the tariff, *qua* adhesion contract, strictly in favor of Appellant. I believe that the majority errs in declining to do the same.

Rule 12.1 declares that "[t]he Company is ... not liable for any damages due to accident, strike, storm, riot, fire, flood, legal process, state or municipal interference, or any other cause beyond the Company's control." Allowing, as set forth above, that PECO could not disclaim liability for willful or wanton misconduct even if it tried, *see Behrend, supra,* it is difficult to identify a plain-language reading of "any damages due to accident" and the litany of other excluded categories of harms that follow that leaves any residual liability outside that imposed as a matter of law for willful or wanton misconduct.

As the majority correctly notes, "accident" primarily is defined as "[a]n unexpected, undesirable event," or more generally "an unforeseen incident." American Heritage College Dictionary 8 (3d ed.1993). I am confident that PECO considers a catastrophic power surge to be an "unexpected, undesirable event." And if PECO is correct that the surge was caused by lightning, that surely is encompassed by the word "storm."

However, it is necessary to consider whether the clause disclaiming liability for "any other cause beyond the Company's control" affects the majority's all-encompassing reading of the word "accident." First, it is interesting that PECO maintains, and the majority agrees, that what is alleged to have occurred here—*i.e.,* a power "surge" or "spike," whether due to lightning or a different cause—was not foreseeable. PECO's claim seems somewhat disingenuous in light of the last sentence of Rule 12.1. In that sentence, after

the rule arguably disclaims every form of liability that the law permits PECO to disclaim for damages arising from such causes, PECO offers that "[a] variety of protective devices ... that may prevent or limit such damage are available for purchase by the customer from third parties." Evidently, damage from "spikes" and "surges" in electricity is foreseeable after all, and can be managed by commercially available "protective devices."

Second, given the collective breadth of the terms that follow the word "accident" in Rule 12.1, which encompass everything from "storm" to "legal process," the limitation clause, by its plain language, at least arguably precludes liability, quite literally, for any harm arising from events "beyond [PECO's] control." If we assume that PECO does not consider unintentional service interruptions to be within its control, and in light of the broad language regarding what count as matters beyond PECO's control, as well as our long-standing reluctance to apply disclaimers of liability in the context of adhesion contracts, it remains very difficult to see what matters might remain as to which PECO would be liable under the first paragraph. Regardless, to the extent that PECO ventures a textually colorable interpretation that affords some restricted domain of liability in excess of that imposed by law, one must conclude that Rule 12.1 is ambiguous in critical regards, and subject to those interpretive precepts that require us to prefer an interpretation that favors Appellant as the non-drafting and disadvantaged party.

The majority, however, neglects to incorporate these additional categories and the ambiguity they engender into its analysis. Instead, the majority focuses exclusively on the rule's particular reference to "accidents" and its elastic clause, arguably redundant relative to the other specific exclusions, precluding all liability for "any

other cause beyond the Company's control." Even more problematically, the majority, ostensibly reading Rule 12.1's terms as unambiguous, supports its ruling by creating a specific reference to negligence where none exists. The majority does so by injecting the definition of "accident" (again excluding the several other categories of harms expressly enumerated in the same sentence), which undeniably incorporates the notion of an "unforeseeable" event (another word omitted from Rule 12.1), into the textual phrase "cause[s] beyond the Company's control" and mixing the result with the observation that "foreseeability" is an element of negligence. The majority reduces this resultant admixture to the dubious conclusion that the exclusion of all liability for "cause[s] beyond the Company's control" does not exclude all liability for negligence claims. Accordingly, the majority concludes that the provision as a whole is not exculpatory.

However, reams of prior precedent establish that general contractual terms must yield to more particular terms. This rule is ever so much more important when the general term purports to extend a list of particular terms. *See Marcinak v. S.E. Greene Sch. Dist.*, 375 Pa.Super. 486, 544 A.2d 1025, 1027 (1988) ("[S]pecific provisions of a written contract ordinarily will be regarded as qualifying the meaning of broad general terms in relation to a particular subject."); Restatement (Second) of Contracts § 203 ("In the interpretation of a promise or agreement or a term thereof ... specific terms and exact terms are given greater weight than general language....."). Thus, causes beyond PECO's control must be bounded, or at least informed, by the full list preceding the phrase—not just the word "accident," the rather general term relied upon by the majority, but also the neglected terms "strike, storm, riot, fire, flood, legal process, [or] state or municipal interference."

Obviously, these events are sufficiently "foreseeable" to be enumerated in advance. Moreover, as a practical matter, negligence in the context of supplying electricity often, if not always, will arise in connection with just such events, precisely as Appellant alleges in this case. Even if the majority were correct that the "beyond PECO's control" language implicitly incorporates notions of foreseeability, which, in turn, necessarily entail that PECO intended residual liability for negligence—in itself, a bridge two steps too far given the requirement of specificity in contract language disclaiming liability—the enumerated excluded categories of liability-creating causes following the word "accident" surely incorporate all, or at least a vast majority, of conceivable negligence claims. Put simply, the clause the majority tortures into one preserving some exposure to damages for negligence simultaneously excludes many, if not all, frameworks in which negligence might actually occur in connection with the delivery of electricity. Hence, that clause either has the *de facto* effect of excluding liability for negligence entirely, or it is utterly incoherent. For this reason, I believe the majority's interpretation is untenable.

Precisely because we seek to parse a provision susceptible to multiple interpretations, we must assess Rule 12.1 as a whole rather than in its constituent parts, and seek to make sense of it in its entirety. *See Bethlehem Steel Corp. v. MATX, Inc.*, 703 A.2d 39, 42 (Pa.Super.1997) (quoting *Marcinak*, 375 Pa.Super. 486, 544 A.2d 1025, 1027 (1988)) ("[I]n construing a contract, each and every part of it must be taken into consideration and given effect, if possible, and the intention of the parties must be ascertained from the entire instrument."). Moreover, we must resolve any ambiguity in favor of Appellant as the disadvantaged party, interpreting the ex-

**938**

culpatory clause "strictly" as something disfavored by the law and with "every intendment against the party who seeks immunity from liability"; asking whether the contract "spell[s] out the intention of the parties with the greatest of particularity"; and declining to infer any intention from "words of general import." *Richard's 5 & 10, Inc. v. Brooks Harvey Realty Investors,* 264 Pa.Super. 384, 399 A.2d 1103, 1104–05 (1979) (quoting *Employers L.A.C. v. Greenville B. Men's A.,* 423 Pa. 288, 224 A.2d 620, 622 (1966)).

I have examined the first paragraph of Rule 12.1 above. The second paragraph, which leads with the phrase "[i]n all other circumstances," purports to provide instances of at least partially compensable damages that might result from those circumstances, including "damage to computers and other electronic equipment and appliances, loss of business or loss of production caused by any interruption, reversal, spike, surge or variation in supply or voltage, transient voltage, or any other failure in the supply of electricity." Manifestly, "interruption" and "any other failure in the supply of electricity" are encompassed as a matter of plain language in the contingencies identified in the first portion of the first paragraph. That leaves damages resulting from a "reversal, spike, surge, or variation in supply or voltage, [or] transient voltage" arising from sources **within PECO's control** as the only plausible bases for the limited damages allowed in the second paragraph. But I discern no basis to conclude that any of these events would not be "accidental" on any fair read-

ing of that word, whether negligently so or otherwise. Similarly, I am not persuaded that any such damages that were not accidental would not be facially barred as caused by one of the other categories of events for which liability is absolutely excluded by the first paragraph. Consequently, I believe that Rule 12.1, interpreted in favor of Appellant, must be read as exculpatory and thus unenforceable. Given the negotiating disadvantages facing any PECO consumer, language with such obfuscatory effect, if not intent, cannot be sufficient to shield PECO from virtually all liability for catastrophic loss.

In *DeFrancesco,* we qualified our deference to PUC-approved tariffs with our historically broad skepticism regarding disclaimers of liability, especially in the public sector and in cases where the parties to the agreement do not bargain on an equal footing. *Cf. Employers Liability Ass. Corp., Ltd., v. Greenville Business Men's Assoc.,* 423 Pa. 288, 224 A.2d 620 (1966) (finding private parties' exculpatory clause valid if (1) it is **not** a matter of interest to the public or State; (2) the contract relates entirely to parties' private affairs; and (3) each party is a free bargaining agent and the clause is not in effect a contract of adhesion); *accord Zimmer v. Mitchell & Ness,* 253 Pa.Super. 474, 385 A.2d 437, 439 (1978).[2] Drawing upon *Warren City Lines* and section 195 of the Restatement, we took into account concerns regarding the more powerful party's incentive to protect consumers:

---

**2.** Many courts around the country have ruled similarly in the utility provider context. *See, e.g., Zoller v. Niagara Mohawk Power Corp.,* 137 A.D.2d 947, 525 N.Y.S.2d 364, 367 (1988) ("[E]xculpatory clauses should be strictly construed against the person seeking exemption from liability." (internal quotation marks omitted)); *Richardson–Wayland Elec. Corp. v. Virginia Elec. & Power Co.,* 219 Va. 198, 247

S.E.2d 465, (1978) ("Because public policy forbids it, ... public service companies ... may not contract against liability for the breach of public duties.... Indeed, considering the high degree of care required of distributors of electricity, application of such a rule to power companies is especially appropriate." (internal quotation marks and citations)).

[T]he party transferring the risk has no incentive to use reasonable care when it is held harmless for all losses resulting from its own negligence, and its insurer has no incentive to provide the transferor with loss prevention services or inspection. This creates a particularly dangerous situation for the public where 1) the party transferring the risk is better able to prevent loss or reduce the risk associated with loss, or 2) where the party to whom the risk has been transferred does not fully realize the responsibility which it has received.

*DeFrancesco*, 478 A.2d at 1307 (quoting *Warren City Lines*, 287 A.2d at 151–52); *cf. Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 204 (3d Cir.1995) ("[S]o long as the limitation [of liability clause in a private contract] ... is reasonable and not so drastic as to remove the incentive to perform with due care, Pennsylvania courts uphold the limitation").[3] As additional bases for our reluctance to uphold such disclaimers, we cited the lack of incentive of a water utility insulated from liability to ensure an adequate supply of water; the utility's ownership of, and exclusive responsibility for, the maintenance of its facilities; and the likely lack of consumer awareness of the exculpatory clause or its effect in transferring to the consumer sole responsibility for damages caused by the utility's failings or omissions. *Id.*

I discern no cause to deviate from *DeFrancesco's* embrace of the Restatement's principles. Although section 195's commentary anticipates and approves "reasonable" limitations of liability, thus leaving room for our treatment of PUC-approved tariffs containing limitations of liability as binding law, that provision and *DeFrances-*

co, both of which insert a "reasonableness" element, call for a more nuanced inquiry. *See also Hamilton Employment Serv. v. N.Y. Tel. Co.*, 253 N.Y. 468, 171 N.E. 710, 710 (N.Y.1930) (holding that unless a damage limitation "is reasonable, it is not binding upon plaintiff").

In light of the foregoing, I would hold that Rule 12.1 of PECO's tariff is exculpatory, and thus unenforceable as contrary to the public policy of the Commonwealth of Pennsylvania. Consequently, I would reverse the trial court's grant of PECO's motion for partial summary judgment and its denial of Appellant's countermotion. Because I would find that the plain language of PECO's tariff is exculpatory and hence unenforceable in its entirety as against public policy, I would not need to address whether PECO's tariff can—or in this case did—bar or limit damages for strict liability. As noted, however, I join the majority in its conclusion that PECO failed successfully to disclaim such liability in the tariff at bar.

Similarly, I would not need to address Appellant's argument that the limitation of liability at issue, even if it is not facially exculpatory, is unreasonable and constructively exculpatory. Nonetheless, I find it noteworthy that, were *Behrend* to be applied in the strong sense embraced by the majority, it might render enforceable a utility's PUC-approved limitation on liability for negligence to $100 or $5 or even $1. It is difficult to imagine a materially more severe limitation of liability clause than one that limits damages to $500 even when electricity, the most dangerous consumer deliverable [4] over which PUC has regulato-

---

3. This principle applies with particular force to Appellant's strict products liability claim. *See Williams v. W. Penn Power Co.*, 313 Pa.Super. 461, 460 A.2d 278, 287, *rev'd on other grounds*, 502 Pa. 557, 467 A.2d 811 (1983).

4. *See Slater v. Penna. Power Co.*, 383 Pa.Super. 509, 557 A.2d 368, 370 (1989) (citing *Kintner v. Claverack Rural Elec. Co-op., Inc.*, 329 Pa.Super. 417, 478 A.2d 858 (1984)) (deeming electricity "an inherently dangerous

ry authority, has burned homes to the ground. When the permissible damages are several orders of magnitude smaller than the actual damages in the offing, the difference between $500 and these smaller increments is semantic at best and of no practical consequence to the injured party. If no Pennsylvania court has the authority to review PUC's evaluation of the reasonableness of a given liability limitation, that body's discretion is unfettered to an extent far in excess even of that bestowed upon the General Assembly, which delegated PUC its authority in the first instance. This state of affairs arguably contravenes fundamental principles of judicial review and separation of powers, an unacceptable result.

For the foregoing reasons, I respectfully dissent.

instrumentality" as to which the supplier must employ the "highest standard of care"); *Bryant v. Tri–County Elec. Membership Corp.,* 844 F.Supp. 347, 352 (W.D.Ky.1994) ("The citizen's dependence upon, and vulnerability to, electricity is almost without parallel in modern life.... Indeed, a defect in electrical current often reveals itself only when it causes a catastrophe."); *Grant v. S.W. Elec. Power Co.,* 20 S.W.3d 764, 772–76 (Tex.App.2000) (distinguishing between a utility's privilege to limit by tariff liability for economic damages and its inability to do so for damages for personal injury because such a limitation would be unconscionable).